**STATE of Utah, In the Interest of PITTS, Erika R. and Pitts, Vallarey L., persons under 18 years of age, Gloria Gandy, Appellant.**

**No. 13882.**

Supreme Court of Utah.
May 14, 1975.

---

Gordon F. Esplin, of Salt Lake County Bar Legal Service, Salt Lake City, for appellant.

Vernon B. Romney, Atty. Gen., Frank V. Nelson, Asst. Atty. Gen., Salt Lake City, for the State.

HENRIOD, Chief Justice:

Appeal from the denial of a motion to vacate a juvenile court order *permanently depriving* the parents of custody and terminating all parental relationship of and to their two minor infant girl children, and *placing them* with an agency *for adoption.* It is adjudged that said order (July 16, 1974) be vacated as prayed.

This case is here solely on the record before us having to do only with the motion to vacate, the evidence adduced at the hearing thereon, the order denying it, October 17, 1974, and the order of permanent deprivation, July 16, 1974. The two orders above followed the delivery of the children by the paternal grandmother, Hattie Pitts, to a Welfare Department "shelter" on or about November 9, 1973, (because, as the record reflects, she was financially incapable of supporting them).

One Carlson, an employee of the State Division of Family Services, testified that he filed a petition on November 30, 1973 (which is not in the record before us), which contained allegations that the children had been left with an acquaintance at a Baywood Hotel, where some days later the room caught fire, and the children thereupon were delivered to Hattie;[1] that the whereabouts of the parents were unknown, and that the parents had failed to provide adequate support and supervision for the children. This petition was heard on January 8, 1974. Prior thereto, said Carlson, he had 1) "checked with the post-office to see if the father *or* mother were listed as receiving mail in the Salt Lake Valley," receiving a "No" answer. He then checked the Baywood Hotel (after the fire that apparently caused a transfer of the children to Hattie), to see if the parents were getting mail there, then checked with the local power company to see if they were customers, being told they were not, after which he filed in the clerk's office, the petition with an affidavit for pub-

---

[1] Who, as stated above, delivered them to the shelter.

lication of notice thereof,—and *that's all he did*.

One Meyers, who is completely unidentified in the record, said he did two things after Carlson had made inquiries, which were done in January or February, so that they were done long after the petition was filed on November 30, 1974, and hence of no probative value whatever in connection with "due diligence" in locating the parents.[2]

A Mrs. Lu Jean Smith, D.F.S. worker, testified that she knew Hattie when the latter brought the children to the shelter and said she didn't know where the parents were. She checked with the baby sitter who had been at the Baywood Hotel, who didn't know where they were either.

Betty Mattson, another D.F.S. employee, knew the children's mother. This employee said she filed a Petition for Permanent Deprivation of the parental rights on May 9, 1974, since "the parents had not made contact" with the children "since November 9, 1973 . . . a period of more than six months"[3] and "it appeared to me that neither parent was going to return at that point." She also said *she* signed an Affidavit for Publication of Notice. Finally, after the July 16, 1974, hearing and order of Permanent Deprivation, Miss Mattson had contact with the mother between August 5 and 10, 1974, when the lat-

ter, after returning to Salt Lake, had called upon the former inquiring as to the whereabouts of her children,—when Mattson told the mother in no uncertain terms that "she had been permanently deprived" of the children and that "the children were being placed for adoption, and that she could not see them,"—nor would Mattson "tell her the foster home at which they were placed" and that *she* (the mother) *seemed upset*.

Based on the evidence as recited above, the juvenile court made a finding of fact that "The efforts of the . . . Division of Family Services to locate an address for the *parents* were diligent pursuant to Section 55–10–88, Utah Code Annotated 1953."

 It is suggested that the evidence recited above clearly indicates that there was no "diligent inquiry" made and that this matter is dispositive in favor of the mother and father of these children, if, for no other reason than that there is no evidence whatsoever, of any effort to locate the father except for an alleged telephone check with the postoffice, power company, and a hotel where there is no evidence that either parent resided, and a doubtful Publication of Notice, so far as this record is concerned, there having been no inquiry of any persons or relatives or anything else with respect to the children's father. In

---

2. We list his efforts here, for informational purposes only and to show not "diligent inquiry" but the *lack* of "diligent inquiry," and to show that even though he may have made the effort before the petition was filed, in no way would it have been the kind of diligence required to strip away from a mother and father all parental rights. He went to Hattie's home, and was told that she did not know where Gloria, the mother of the children, was, but there is no evidence whatever, to indicate that be bothered to ask where Hattie's own son, the father of the children, was. Then he looked in the phone book to see if he could locate Clara Gandy, the maternal grandmother. He said "I found four Gandys listed, none of which were Mrs. Gandy." There is nothing in the record to indicate he called any of those listed, but it is highly significant that he said one was a wrecking com-

pany. Two of the three numbers of persons listed represented the same phone, and the same address, and referred to a husband and wife. A bit of "diligent inquiry" would have shown this fact, had he looked in Polks 1974 Salt Lake City Suburban Directory on page 312. Such bit of "diligent inquiry" would have revealed in the same directory on the same page, the listing of a Mrs. Clara Gandy, —the name of the very person he was seeking.

3. It was six months to the day, which suggests an unwarranted and premature effort to place these children out for adoption before the parents' return (which the petition she filed called for), and the resulting default judgment of July 16, 1974, ordered placement of the children with D.F.S. "for *placement in a suitable adoptive home*."

addition to and a further weakening of such weakness of inquiry, the following uncontradicted facts are reflected in the record to enhance the ridiculosity of permanently stripping parents of their parental rights,—which means *forever, gentle reader:*

Gloria Gandy, is the mother of the children, Lawrence Pitts is the father, and his mother, Hattie Pitts, is the paternal grandmother. Clara Gandy is the maternal grandmother.

In October or November, 1973, Gloria saw Hattie to see if she would take care of the children for awhile, while she (Gloria) was gone. She did not leave them at that time with Hattie for some undisclosed reason, but left them with Wanda Brown, a friend, who was happy to have them and wanted to keep them until she got back. Gloria told her to keep them a few days, then take them to Hattie. She went to Tampa, Florida, was there with the children's father until the following July, during which time she tried to make contact with the children. She called her mother several times and wrote to Hattie, with no reply. She got in touch with her mother, through her sister, who answered the phone, about April or May, near her birthday. She gave her sister her address and asked how the kids were. She kept writing to Hattie, with no response. When she came back she called on Hattie but was told the latter had moved. Then she saw her mother who told her the children were up for adoption. She called Betty Mattson who told her she couldn't see the children nor would she be told where they were. At this juncture she hired a lawyer; she volunteered that: "I love my children very much and really do care for them. . . . I just had to leave town but was planning to send for them. I didn't think anything like this would happen. No one contacted me about the proceedings with the Court." She talked to her mother the end of July or in August, 1974. On cross-examination she said she went to Tampa because she "was in trouble with the law." No reason therefor was requested and none was volunteered. She said she didn't expect Hattie to take care of the children, but knew she would manage, and that she didn't think she'd be gone away so long. Asked if the postoffice returned any letters she sent to Hattie, she said "no, why should they?"—which makes sense.

Gloria's mother, Clara Gandy, said the Division of Family Services did not contact her at any time. She didn't contact Gloria until July or August. She said Gloria contacted her other daughter by phone, that she, Clara, tried unsuccessfully to contact Hattie until August and was told that she took the children to the Welfare. She said no one contacted her by mail, phone or personally to ask where Gloria was. There is no evidence that the other daughter ever was contacted. She said her daughter gave her Gloria's address around March or April, "after the kids' birthday." Counsel for the court, at some length, and in a somewhat uncavalier manner, elicited an answer from Hattie to the effect she didn't really know and was confused. Gloria, on the sideline, volunteered "Mom, I called you in March. It was right after *my* birthday." Counsel for the court responded by saying, "Will you shut up and let her answer the question?" evincing some sort of inverted saintly effort to get at the truth, it would seem. The judge backed him up with an admonishment.

The only substantial or effective impeachment as to the facts were on cross-examination of the grandma, Clara, who not only confessed her confusion as to what appeared to be a rather immaterial fact, but who obviously displayed considerable affection for her daughter and grandchildren.

The facts abstracted above presented by Gloria are uncontroverted save as mentioned above. The state presented only facts relating to time Gloria was absent,

and what some aides of the Division of Family Service did that was claimed to constitute "diligent inquiry."

It is significant that the children's grandmother, Clara Gandy, was a resident, knew Gloria's address, as did Gloria's sister. More significant is what the State did *not* do. It did *not* do anything showing any diligent inquiry with respect to the children's father,—and so far as this record is concerned apparently did *not* even inquire of his own mother where he was. It did *not* contact Clara, made no phone calls to any of what amounted to only two Gandys in the phone book, did *not* bother to examine the 1974 directory that presumably had all the names and addresses of all the residents in the Salt Lake area, and if it *did* examine such directory it failed to find the name and address of Mrs. Clara Gandy plainly printed therein. The *weekly* newspaper in which it published notice of hearing, had a comparatively small circulation in Salt Lake County, which likely may not have had as wide a potential for notification and which, *in a case like this,* along with other claimed acts of diligence, would seem not to constitute reasonable diligence in alerting someone, nor the most "diligent" means of notice, since it is fairly common knowledge that its circulation is about one per cent of that of the largest metropolitan *daily* paper published in Utah, where the chance of reaching the parents here, or interested relatives who might be alerted, is one hundred to one. If the people involved in this case had shown as much compassion for the parent-child relationship, and less for split-second speed in procedure designed to accommodate the baby market that flourishes in this country, whether black, gray, red or statutory, the State, with its facilities, certainly could have used better and faster means for finding the whereabouts of this mother.

This writer is impressed with a concession made by counsel for respondent, nonetheless, to the effect that:

Respondent cannot help but agree with appellant's contention that the deprivation of parental rights is a drastic action which must be handled through in personum procedures. Children are not realty, and rights pertaining to them must be handled with care and proper procedure. Appellant, however, wants this Court to believe that such is an absolute standard which has very few exceptions, if at all.

We believe such language comes close to our thinking to the effect that a child should not be taken from its parents save by clear and convincing evidence of intention to give up parental rights,—something almost akin to proof beyond a reasonable doubt. The respondent, having made the quoted pronouncement must have difficulty,—particularly with that part about realty,—when it cites Redwood v. Kimball,[4] to support the chopping off of parents' rights, since that was a suit to quiet title to realty. This provokes some interesting language of the U. S. Supreme Court in Walker v. Hutchinson City:[5]

"It is common knowledge that mere newspaper publication rarely informs the landowner of proceedings against the property," and "In too many instances notice by publication is no notice at all."

Certainly this language is quite apt in this case where a paper's circulation is so small as to be about one per cent of that which would be provided in a paper whose circulation is a hundred times as great in circulation,—all for a very few dollars more.

Respondent's citing of Lloyd v. Third District Court,[6] also has its differences between the instant case, since it is a divorce action with the so-called marital res extant in this state. It is quite understandable

4. 20 Utah 2d 113, 433 P.2d 1010 (1967).

5. 352 U.S. 112, at 116–17, 77 S.Ct. 200, at 202–203, 1 L.Ed.2d 178.

6. 27 Utah 2d 322, 495 P.2d 1262 (1972).

that married people who have no other kinship, and who are adults, should be amenable to service by publication,—a lot more and perhaps with a little less "diligent inquiry" than where a *blood relationship* is involved,—not the case two *adults,* a man and wife,—but between an *adult* and a *minor.* Some social service workers in their zeal, may be naturally the victims of some sort of biological myopia, or are unenlightened or calloused as to the depth of motherly affection, sometimes forgetting that blood is thicker than printer's ink, that absence makes the heart grow fonder, and that instinct itself waters down the oft-repeated, but as often trited aphorism that the welfare of the child is the only concern of the judiciary. They sometimes forget that even though a mother disciplines her child by administering a spanking, the one spanked almost always seeks asylum and confort in the very arms that administered the discipline.

We believe that the evidence in this case is almost a complete stranger to and hardly equates with that high standard of care and diligence necessary in seeking out parents when troubled human waters brew. Any fracture of such relationship should be condoned only by clear evidence of the highest quality.

We are of the opinion and hold that the proof here does violence to the far reaching order of permanent deprivation of parental rights,—amounting to forever, which is a long, long time.

ELLETT, TUCKETT and MAUGHAN, JJ., concur.

CROCKETT, Justice (concurring separately).

In view of the fact that the majority of the court are of the opinion that the order should be set aside, I voice no objection thereto. This, because I assume that opens the way for proceedings on the merits as to what should be done about these children. I realize that the requirement of diligent search for a parent in such situations is not without difficulties. Nevertheless there are circumstances where the duly authorized publication "in a newspaper having general circulation in the county in which the action is pending" serves a necessary and useful purpose. It is authorized by our Rule 4(f)(1), U.R.C.P., and had since time immemorial been recognized as valid by our statutory, (see former Section 104–5–12, U.C.A.1943), and by our decisional law, see Ricks v. Wade, 97 Utah 402, 93 P.2d 479; and 126 A.L.R. 664.

It is worthy of comment here that Rule 4(f)(1), just referred to, was amended on June 26, 1972, to provide that if " . . . the court determines that service by mail is just as likely to give actual notice as service by publication, the court may order that service . . . " may be made by mail.