**2021 UT 19**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

IN THE INTEREST OF G.D. AND M.D., PERSONS UNDER EIGHTEEN YEARS
OF AGE

R.D. and C.W.,
*Appellants,*

*v.*

STATE OF UTAH,
*Appellee.*

No. 20190946-SC
Heard October 13, 2020
Filed June 10, 2021

On Certification from the Court of Appeals

Fourth District Juvenile Court, Provo
The Honorable Brent H. Bartholomew
Nos. 1118780, 1168968

Attorneys:

Neil Skousen, Orem, Sara Pfrommer, Bountiful, for R.D., appellant

Margaret P. Lindsay, Barbara A. Gonzales, Provo, for C.W.,
appellant

Sean Reyes, Att'y Gen., Carol L.C. Verdoia, John M. Peterson, Asst.
Att'ys Gen., Salt Lake City, for State of Utah, appellee

Martha Pierce, Salt Lake City, Guardian ad Litem for G.D. and M.D.,
appellees

CHIEF JUSTICE DURRANT authored the opinion of the Court, in
which ASSOCIATE CHIEF JUSTICE LEE, JUSTICE HIMONAS, JUSTICE
PEARCE, AND JUSTICE PETERSEN joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

## Introduction

¶1    The juvenile court terminated a mother and father's parental rights based on years of dysfunctionality, substance abuse, and criminal conduct. They challenge this determination on appeal, raising three issues in their individual briefs.[1] First, they argue the juvenile court erred in declining to apply the "beyond a reasonable doubt" standard of proof. Second, they argue the standard of review for termination cases we used in *State ex rel. B.R.* is too deferential.[2] And third, they argue the juvenile court erred by concluding that termination was strictly necessary and in the children's best interests. We address each argument in turn.

¶2    First, we affirm the juvenile court's decision not to apply the "beyond a reasonable doubt" standard of proof. Although the U.S. Supreme Court has opened the door for states to adopt an evidentiary standard higher than "clear and convincing" for termination proceedings, both this court and the Utah legislature have not, contrary to what Parents argue, adopted the "beyond a reasonable doubt" standard. And we decline to adopt that standard now.

¶3    Second, we disagree that the standard of review we used in *State ex rel. B.R.* is too deferential. Contrary to what Father argues, we do not read our decision in *State ex rel. B.R.* as creating a unique standard of review for juvenile courts. Rather, the standard in *State ex rel. B.R.* echoes the standard of deference used in other cases: that appellate courts defer to trial courts' findings of fact. So by treating *State ex rel. B.R.*'s standard as unique, Father overlooks the well-established principle that appellate courts are not generally in a position to second-guess the factual determinations of trial courts.

¶4    Finally, we reject Parents' argument that the district court erred in concluding that termination was strictly necessary and in the best interests of the children. After reviewing the record, we

---

[1] Notably absent from the briefs is any argument that the court erred in concluding Parents were unfit. This is likely because Parents both conceded their unfitness when they admitted to neglecting G.D. and M.D. *See* Utah Code § 78A-6-507(1)(b) ("[T]he court may terminate all parental rights with respect to the parent if the court finds . . . that the parent has neglected . . . the child.").

[2] 2007 UT 82, 171 P.3d 435.

conclude that, in reaching its conclusion, the court gave full and careful consideration to all the evidence presented.

## Background

¶5 This case concerns two of Parents' children: G.D. and M.D. At the time of the juvenile court's decision, G.D. was five years old and M.D. was one year old. Parents have struggled with substance abuse and mental illness for several years. This case is the culmination of that struggle and the State's efforts, through juvenile courts and the Division of Child and Family Services (DCFS), to protect G.D. and M.D.

¶6 Over the last five years, G.D. has been removed from Parents' home three times. In each of these instances, DCFS filed petitions for custody of G.D. based on a combination of parental neglect, substance abuse, mental illness, criminal conduct, and parenting deficits. During G.D.'s third removal from the home, M.D. was also removed for the first time.

¶7 Shortly before both children were removed from their home, a woman contacted the police in the middle of the day, alleging that she was caring for the children because Father had overdosed. After finding Father unconscious, the police questioned him about his drug use. Father confessed to using methamphetamine and opiates, and the police found drug paraphernalia in the home. Father also admitted to DCFS that he used methamphetamine on two occasions and used heroin to fall asleep on one occasion. But he claimed that Mother was not aware of his drug use—a claim that was contradicted by the fact that Mother had previously contacted DCFS to report concerns about Father's drug use.

¶8 Because DCFS became concerned about Father's drug use, Father voluntarily assigned temporary custody of G.D. to the children's grandmother. DCFS made a safety plan with Parents, according to which G.D. would not be left alone with Father, Parents would both submit to drug testing, M.D. would remain at home,[3] and G.D. would remain with Grandmother. But shortly thereafter, Father again tested positive for morphine and methamphetamine, and Mother did not submit to drug testing.

---

[3] The record does not state this as an explicit component of DCFS's safety plan, but it does imply that M.D. was at home until DCFS took her into protective custody when Parents failed to cooperate with the safety plan.

¶9   In light of Parents' failures to follow DCFS's safety plan, DCFS filed a petition for custody of G.D. and M.D. DCFS took M.D. into its custody and completed a safety assessment, concluding both children were unsafe.[4] At a shelter hearing pursuant to DCFS's petition, the juvenile court placed G.D. in the temporary custody and guardianship of Grandmother but kept M.D. in the protective custody of DCFS pending a continued shelter hearing.

¶10  At the continued shelter hearing, the court found there was a substantial risk the children would suffer abuse or neglect if it did not remove them from Parents' custody because Parents had both tested positive for methamphetamine. Accordingly, the court placed both children in DCFS's temporary custody and guardianship.

¶11 With future custody hearings pending, Parents' troubles with substance abuse and law enforcement continued. In the evening after the continued shelter hearing, police found Father under the influence of opiates and arrested him. Father was also subject to pending charges for driving with a measurable controlled substance and on a suspended license. Meanwhile, Mother submitted to drug testing, testing positive for methamphetamines.

¶12 Over the course of their dealings with DCFS during this time, Parents repeatedly concealed one another's drug use from DCFS, prioritizing hiding their drug use over the children's interests. Between the continued shelter hearing and a disposition hearing held about two months later, Mother was found guilty of driving on a suspended or revoked license, Father was convicted of driving under the influence, and Mother and Father were evicted from their home.

¶13 Because DCFS and Parents failed to resolve the problems identified in DCFS's petition for custody through mediation, the juvenile court scheduled a preliminary hearing on Parents' fitness. At this hearing, Father admitted to neglecting G.D. The court also heard evidence about Father's criminal history[5] and evidence

---

[4] The court noted that there were errors in the safety assessment but concluded that, had DCFS done the assessment correctly, the assessment would have resulted in an even stronger indication that the children were unsafe.

[5] At the time of the trial, Father's criminal history included the following: joyriding; seven instances of possession of drug paraphernalia; attempted unlawful acquisition, possession, or
(Continued)

suggesting that he was likely to remove the children from Grandmother's guardianship at any time.

¶14 The court also heard evidence regarding Mother's unfitness, evidence that Mother had admitted to neglecting both children, and evidence about Mother's criminal history.[6] The court noted that, in a previous proceeding regarding G.D., Mother lost the presumption[7] that custody with her was in G.D.'s best interests.

¶15 The court held the disposition hearing in late April 2019, but Father failed to appear. At that hearing, the court declined to order DCFS to facilitate the children's reunification with Mother and Father. Instead, it identified the children's permanency goal as adoption, with a concurrent goal of permanent custody and guardianship.

¶16 In a later pretrial hearing, the State sought partial summary judgment with respect to Parents' fitness. Father failed to appear. At the time of that hearing, he was subject to a $5,000 cash warrant for his arrest for a pending felony drug possession and paraphernalia case.

¶17 Parents then filed a joint motion asking the court to apply the "beyond a reasonable doubt" standard of proof instead of the usual "clear and convincing" standard used in termination

_____

transfer of a car; utility theft; three instances of criminal trespass; two instances of disorderly conduct; theft of mistaken property; theft; reckless endangerment; attempted forgery and theft by deception; retail theft; aggravated assault; two instances of possession of a dangerous weapon by a restricted person; two instances of possession or use of a controlled substance; burglary; disorderly conduct involving domestic violence; unlawful use of a financial transaction card; forgery; criminal mischief involving domestic violence and intoxication; and attempted possession or use of a controlled substance.

[6] At the time, Mother's criminal history included the following: impaired driving; several instances of retail theft; and unlawful acquisition, possession, or transfer of a financial transaction card.

[7] See UTAH CODE § 30-5a-103(1)–(2) ("There is a rebuttable presumption that a parent's decisions are in the child's best interests. . . . A court may find [this] presumption . . . rebutted and grant custodial . . . rights to an individual other than a parent. . . .").

proceedings. The court rejected their motion, and the case proceeded to trial.

¶18 At trial, Dr. Jensen, a clinical psychologist, testified that the combined efforts of Parents, Grandmother, and DCFS had allowed the children to form attached relationships to their caretakers. But he explained that Parents' dysfunctional lifestyle had imperiled this process. And he noted that, without Grandmother and DCFS, custody with Parents would fail. He also testified the children were attached and positively bonded to each other.

¶19 With respect to the children's future, Dr. Jensen testified that, because the children had formed positive relationships in the past, they had a good chance of forming new positive relationships. In light of the children's unstable living situation and M.D.'s age, Dr. Jensen explained that changing M.D.'s custody placement would be less disruptive than leaving her in Parents' care. But, in his view, G.D. would have more difficulty with a change in custody. He added, however, that any delay in finding a permanent placement would only make change more difficult for G.D. and might even cause irreparable harm.

¶20 The court agreed with Dr. Jensen's assessment that Parents had failed to demonstrate they were capable of providing the children a risk- and disruption-free environment. The court also noted that Parents' long struggle with addiction indicated a high risk for relapse, and thus more instability.

¶21 Grandmother also testified at trial. She explained that she already cared for one of Mother's other children and was hesitant to take permanent custody of M.D. and G.D. And although she testified that she might be in a better financial situation after a pending divorce case, she said she did not want to care for the children for more than two years. Instead, she hoped Mother could regain custody within that time period. Dr. Jensen corroborated Grandmother's testimony on this point, adding that, in his view, Grandmother imagines herself in a mere supportive role and hopes her grandchildren will eventually return to live with Parents.

¶22 In addition to this testimony about Grandmother's reluctance to serve as a permanent placement option, the court noted that, while G.D. was in Grandmother's care, she had failed to qualify for foster parent licensing despite DCFS's repeated requests that she do so. Because licensure would have provided Grandmother with additional resources to alleviate her financial concerns until the conclusion of her divorce proceeding, the court found that this

failure "demonstrated that [Grandmother] ha[d] not fully focused on the children's best interests and ha[d] neglected their needs."

¶23 At trial, Grandmother also testified that she had arranged for unauthorized parental visits before trial despite DCFS's requests. Grandmother said she saw nothing wrong with these visits.

¶24 The court found that Grandmother, in arranging these visits, had put the children in danger and demonstrated a lack of judgment. According to the court, Grandmother's actions stemmed from her desire for the children to return to Parents' care.

¶25 After Grandmother, the court heard from one of two prospective adoptive families. Because one of the prospective adoptive fathers had grown up with Father, he and his spouse testified that they were committed to raising the children even though such an arrangement was not their idea. They also testified they were willing to adopt the children if needed. The court concluded that the prospective adoptive parents were capable of becoming licensed foster parents for the children.

¶26 With at least one potential adoptive placement option in hand, the court then concluded that Parents lacked the necessary skills to adequately care for the children. It also concluded that Parents were unfit based on their history of neglect, their unwillingness to improve, and the substantial likelihood they would be ineffective in the near future.

¶27 The court then considered the children's best interests. Because G.D. had been removed from Parents three times, the court determined that G.D. needed to be in an adoptive placement with no potential for further disruption. And the court reasoned that breaking up the children's positive relationship would be detrimental to both of them. So, because of M.D.'s young age and her positive sibling bond to G.D., the court concluded M.D. must be in the same adoptive placement as G.D. The court also noted that returning M.D. to Mother for another chance would be fundamentally unfair and detrimental to M.D.

¶28 After weighing these considerations, the court determined that an adoptive placement would provide both children the best chance for a permanent, stable, continuing, and uninterrupted placement. Additionally, it found no evidence indicating any of the potential adoptive placements identified would withhold safe and positive contact between the children and Parents. So the court concluded that adoption was in both children's best interests. But the court did not settle on a specific adoptive placement option.

¶29 Having concluded that adoption was in the children's best interests, the court considered whether termination was strictly necessary. Before making this determination, the court explained that it was required to consider all relevant facts and circumstances. As part of that analysis, it noted that it was required to explore other feasible options short of termination that might serve the children's needs while also preserving the possibility for rehabilitation of the parent-child relationship.

¶30 In its exploration of the relevant facts and circumstances, the court again referenced the children's young age, explaining that it was legally required to consider only guardianship options with relatives. But it cited no legal authority to support this assertion.

¶31 The court then proceeded to consider the different relative placement options. It concluded that placement with Grandmother was not feasible because Grandmother admitted she could not see herself caring for the children into adulthood and hoped the children could return to live with Parents. And, even if Grandmother could care for the children, the court concluded it could not be assured that she would not return the children to Parents in light of the unauthorized parental visits that had occurred under her supervision.

¶32 Having concluded there was no feasible placement option with relatives, the court summarized its conclusions. It stated that section 62A-4a-205(9) of the Utah Human Services Code mandated adoption for a child under the age of three "if the plan is not to return the child home,"[8] so one-year-old M.D. must be placed in adoption. For G.D., the court concluded that his past experiences under Parents' care necessitated the safety and security of adoption. Accordingly, the court concluded that termination was strictly necessary for both children.

¶33 At the trial's conclusion, the court terminated Parents' parental rights, but it did not determine which of the available adoptive placements would be best for the children.

¶34 Following trial, Parents entered a post-judgment motion for a new trial because Grandmother had been awarded a sum of money in her divorce proceeding. In response to this motion, the court amended its order but did not alter its conclusion to terminate

---

[8] UTAH CODE § 62A-4a-205(9)(a).

Parents' rights. The court did not, however, explicitly consider Grandmother's changed financial circumstances on the record.

¶35 Parents appealed the juvenile court's termination order, arguing that the court erred in rejecting their motion to apply the "beyond a reasonable doubt" standard of proof and their motion for a new trial. They also challenged the court's ultimate conclusion that termination was strictly necessary and in the best interests of the children. The court of appeals then certified the case to this court for review. We issued a replacement briefing order, under which Mother and Father filed individual replacement briefs. In his brief, Father added a request that this court overrule *State ex rel. B.R.*[9] The State and the children's appellate Guardian ad Litem attorney submitted replacement briefs in response. We have jurisdiction under Utah Code section 78A-3-102(3)(b).

## Standard of Review

¶36 Parents claim the juvenile court erred in rejecting their motion to apply the "beyond a reasonable doubt" standard of proof. The applicable burden of proof for termination proceedings is a question of law we review for correctness.[10]

¶37 Parents also claim the juvenile court erred in concluding that termination was strictly necessary and in the children's best interests. Whether the juvenile court correctly concluded there was no feasible alternative to terminating Mother's and Father's parental rights is a mixed question of fact and law. "We review the juvenile court's findings [of fact] for clear error and its conclusions of law for correctness, affording the court some discretion in applying the law to the facts."[11]

## Analysis

¶38 Parents raise three issues on appeal. First, they argue that existing Utah law required the juvenile court to apply the "beyond a

---

[9] 2007 UT 82, 171 P.3d 435.

[10] *In re S.Y.T*, 2011 UT App 407, ¶ 38, 267 P.3d 930. As part of this claim, Father asks us to overturn *State ex rel. B.R.* because he claims that we inadvertently created an impermissibly deferential standard of review in that case. We determine the appropriate standard of review as a matter of law.

[11] *State ex rel. G.B.*, 2002 UT App 270, ¶ 11, 53 P.3d 963 (citation omitted) (internal quotation marks omitted).

reasonable doubt" standard of proof in their termination proceeding. In support, they point to statutory language and case law espousing the importance of parental rights. Alternatively, Parents urge this court to adopt the "beyond a reasonable doubt" standard. We reject these arguments because Utah has adopted the "clear and convincing" standard. And we decline to raise the standard as Parents request.

¶39  Second, Father argues that we should overturn our decision in *State ex rel. B.R.* because it created an impermissibly deferential standard of appellate review for juvenile court decisions. But Father misinterprets *State ex rel. B.R.* The standard we expressed in that case is indistinguishable from the standard of review we have used in other cases.

¶40  Finally, Parents argue the juvenile court erred in concluding that termination was strictly necessary and in the best interests of the children. Upon review of the record, however, we disagree and affirm the court's termination order.

## I. The Juvenile Court Did Not Err in Declining to Apply the "Beyond a Reasonable Doubt" Standard of Proof

¶41  First, Parents argue the juvenile court erred by denying their motion to apply the "beyond a reasonable doubt" standard of proof in their termination proceeding. Citing the Termination of Parental Rights Act,[12] they argue that the legislature and this court have both expressed an intent that juvenile courts use the "beyond a reasonable doubt" standard. We disagree. Alternatively, Parents urge this court to adopt the "beyond a reasonable doubt" standard. We decline to do so, however, because they have failed to persuade us to overturn Utah case law adopting the lower "clear and convincing" standard.

### A. We Do Not Interpret Utah Law as Requiring Courts to Apply the "Beyond a Reasonable Doubt" Standard

¶42 Parents argue that the legislature and this court have expressed an intent that juvenile courts use the "beyond a reasonable doubt" standard of proof. Their argument proceeds in two steps. First, they point out that, in *Santosky v. Kramer*, the U.S. Supreme Court opened the door for states to raise the standard of proof for termination proceedings beyond the "clear and convincing"

---

[12] UTAH CODE §§ 78A-6-501 to -515.

standard.[13] Second, they cite protective language in the Termination of Parental Rights Act as evidence of legislative intent to adopt the "beyond a reasonable doubt" standard. But although we agree that the *Santosky* Court suggested it would be constitutionally permissible for states to adopt a "beyond a reasonable doubt" standard,[14] we do not interpret Utah law as requiring that standard. To the contrary, Utah has explicitly adopted the "clear and convincing" standard.

¶43 In *Santosky*, the U.S. Supreme Court held that "when the individual interests at stake in a state proceeding are both particularly important and more substantial than mere loss of money," the minimum requirements of procedural due process mandate clear and convincing evidence.[15] So, because parental rights are a fundamental liberty interest, petitioners in termination proceedings must prove termination is warranted, at a minimum, by clear and convincing evidence.[16]

¶44 Although "clear and convincing" is the minimum permissible standard of proof for termination proceedings under the U.S. Constitution, in *Santosky*, the U.S. Supreme Court also recognized that the precise standard "is a matter of state law properly left to state legislatures and state courts."[17] That is, state law governs the burden of proof so long as the state-enacted standard does not fall below the "clear and convincing" standard.

¶45 Utah has adopted the "clear and convincing" standard. In 1975, almost seven years before the U.S Supreme Court's decision in *Santosky*, this court first adopted the "clear and convincing" standard for the termination of parental rights.[18] Years later, the Utah

---

[13] 455 U.S. 745, 769–70 (1982).

[14] As we explain below, although the *Santosky* Court suggested it would be constitutionally permissible to raise the standard of proof, it also suggested that raising the standard to "beyond a reasonable doubt" might be impractical. *Id.* at 768–69.

[15] *Id.* at 756 (citation omitted) (internal quotation marks omitted).

[16] *Id.* at 769–70.

[17] *Id*. at 770.

[18] *In re Pitts*, 535 P.2d 1244, 1248 (Utah 1975). We first acknowledged the *Santosky* opinion in our decision in *In re J.P.*, 648 P.2d 1364, 1372 (Utah 1982).

Legislature passed the Termination of Parental Rights Act, requiring petitioners "to establish the facts by clear and convincing evidence" in termination proceedings.[19] So our case law and the Termination of Parental Rights Act have firmly established the "clear and convincing" standard as the appropriate standard in parental rights termination cases.

¶46 Parents' arguments to the contrary are unavailing. They argue that other language in the Termination of Parental Rights Act implies legislative intent for juvenile courts to require something beyond clear and convincing evidence. For example, they point to other language in Utah Code section 78A-6-506(3), which requires courts to "give full and careful consideration to all of the evidence presented"; to section 78A-6-503(1), which authorizes courts to terminate family ties only "for compelling reasons"; and to section 78A-6-503(3), which requires courts to verify that governmental entities' allegations are "supported by sufficient evidence to satisfy a parent's constitutional entitlement to heightened protection against government interference with the parent's fundamental rights and liberty interests." And they point to section 78A-6-507(1), which requires that termination be "strictly necessary" from the child's point of view.

¶47 But even though these statutory provisions are indicative of the fundamental nature of parental rights, they do not amount to legislative intent to require application of the "beyond a reasonable doubt" standard. The best evidence of legislative intent is "the plain language of the statute itself."[20] And the text of section 78A-6-506(3) explicitly requires clear and convincing evidence, nothing more. To interpret section 78A-6-506(3)—in light of nearby statutory language—as requiring the "beyond a reasonable doubt" standard, when the text clearly states otherwise, would be unsupportable.

¶48 Admittedly, the statutory provisions Parents cite highlight the degree of care and attention Utah courts should devote to cases that implicate parental rights. But the U.S. Supreme Court, this court, and the legislature have agreed that the "clear and convincing" standard provides adequate procedural protections for these important rights.

---

[19] UTAH CODE § 78A-6-506(3).

[20] *State v. Martinez*, 2002 UT 80, ¶ 8, 52 P.3d 1276.

¶49 In sum, in *Santosky*, the U.S. Supreme Court held that a "clear and convincing" standard of proof is constitutionally sufficient to safeguard parental rights in termination cases. And even though the *Santosky* Court suggested that states could raise the standard of proof, neither this court nor the legislature has elected to do so. Accordingly, we reject Parents' argument that existing law requires courts to apply a "beyond a reasonable doubt" standard.

### B. We Decline Parents' Invitation to Overrule Precedent and Adopt the "Beyond a Reasonable Doubt" Standard

¶50 Alternatively, Parents argue that we should use this case as a vehicle to elevate that standard to "beyond a reasonable doubt."[21] As with their first argument, this one proceeds in two steps. First, Parents challenge the U.S. Supreme Court's reasoning in *Santosky*—which suggested that the "beyond a reasonable doubt" standard may be unworkable in termination proceedings.[22] Second, they argue that adopting the "beyond a reasonable doubt" standard is warranted for three reasons: (1) New Hampshire and the federal Indian Child Welfare Act (ICWA) apply the "beyond a reasonable doubt" standard without undue complications; (2) society has a new understanding of childhood trauma; and (3) the informal nature of juvenile court proceedings exacerbates the resource imbalance between the State and parents subject to termination proceedings.

¶51 Because accepting Parents' invitation to adopt the "beyond a reasonable doubt" standard of proof would require us to overrule previous Utah cases in which we adopted the "clear and convincing"

---

[21] The State suggests in its brief that this court has authority to override the legislature's adoption of the "clear and convincing" standard in the Termination of Parental Rights Act because, the State avers, "the determination of appropriate burdens of proof is a core judicial function." *See* UTAH CODE § 78A-3-103(1) ("The Supreme Court shall adopt rules of procedure and evidence for use in the courts of the state."). Operating under that assumption, the State addressed the merits of Parents' policy arguments in favor of adopting the "beyond a reasonable doubt" standard. But we ultimately hold that Parents' policy arguments are unavailing, so we do not address the issue of whether the legislature intruded on this court's jurisdiction over rules of evidence and procedure in enacting the Termination of Parental Rights Act.

[22] *Santosky*, 455 U.S. at 768–69.

standard, to prevail on appeal, Parents must overcome principles of stare decisis weighing in favor of that standard.

¶52 "[W]e do not overrule our precedents lightly."[23] Accordingly, our case law has established a presumption against overruling precedent. This presumption is strongest when the reasoning in the opinion we are reviewing is persuasive and the rule established in the opinion has become firmly entrenched in Utah law.[24] So, to overcome the presumption against overruling precedent, parties must persuade us that the rule they wish us to overrule is based on unsound reasoning or was not fully considered and demonstrate that the rule has not been firmly established in our law.[25] At a minimum, this means the party in favor of overruling precedent must provide a basis for questioning our previous decision.[26] But, in their briefs, Parents do not challenge the previous Utah cases in which we adopted the "clear and convincing" standard. Instead, as we mention above, they focus their arguments on the U.S. Supreme Court's decision in *Santosky*. Their arguments directed at the decision in *Santosky* are insufficient to challenge Utah's governing case law.

¶53 In its *Santosky* opinion, the U.S. Supreme Court made three pronouncements relevant to our present discussion. First, as we noted above, the Court set the "clear and convincing" standard of proof as the constitutional minimum for termination proceedings.[27] Second, having established that standard as the constitutional minimum, the Court explained that states are free to adopt higher standards of proof if they so choose.[28] And third, the Court

---

[23] *Rutherford v. Talisker Canyons Fin., Co.*, 2019 UT 27, ¶ 27, 445 P.3d 474 (alteration in original) (citation omitted).

[24] *Eldridge v. Johndrow*, 2015 UT 21, ¶ 22, 345 P.3d 553.

[25] In demonstrating that a rule is or is not firmly established, we frequently consider "the age of the precedent, how well it has worked in practice, its consistency with other legal principles, and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned." *Id.*

[26] *Utah Dep't of Transp. v. Boggess-Draper Co.*, 2020 UT 35, ¶ 44, 467 P.3d 840.

[27] *Santosky*, 455 U.S. at 769.

[28] *Id.* at 769–70.

expressed concerns about the workability of the "beyond a reasonable doubt" standard in termination proceedings.[29]

¶54 Parents acknowledge that the *Santosky* decision is binding on this court. In so doing, they impliedly concede that the "clear and convincing" standard is constitutionally permissible in termination proceedings. But, because the *Santosky* Court opened the door for states to adopt higher standards of proof, they argue that we should do so in this case. And in so arguing, they take issue with the *Santosky* Court's concerns about the workability of the "beyond a reasonable doubt" standard.

¶55 Because nothing in the *Santosky* opinion would require us to adopt the "beyond a reasonable doubt" standard of proof, Parents' argument comes down to a matter of policy. But we are not persuaded by Parents' policy arguments.

¶56 Parents raise three policy arguments for adopting the "beyond a reasonable doubt" standard. They argue that raising the standard is warranted because: (1) New Hampshire and ICWA apply the "beyond a reasonable doubt" standard without ensuing problems; (2) in the years following the *Santosky* decision, society has developed a better understanding of childhood trauma; and (3) the informal nature of juvenile court proceedings exacerbates the resource imbalance between the State and parents subject to termination proceedings. None of these grounds are persuasive.

¶57 Parents' argument regarding the approach employed in New Hampshire and ICWA is misplaced because neither applies the "beyond a reasonable doubt" standard in the manner Parents describe. Similar to Utah's two-step termination procedure, New Hampshire courts assess both parental fitness and the children's best-interests before terminating parental rights.[30] But New Hampshire requires evidence beyond a reasonable doubt only for parental fitness determinations.[31] So it does not apply this exacting

---

[29] *Id.* at 768–69.

[30] *See, e.g., In re William A.*, 705 A.2d 1196, 1197 (N.H. 1998) (discussing a mother's parental fitness in light of "abandonment and nonsupport" in addition to whether termination of the mother's parental rights was in a child's best interests).

[31] *In re Adam R.*, 992 A.2d 697, 701 (N.H. 2010) ("The calculation of a child's best interest is not an evidentiary fact, however, and need not be established 'beyond a reasonable doubt.'").

standard of proof at the stage comparable to Utah's best-interests stage. This is significant because Parents concede their parental unfitness.[32] So even if we were to directly adopt New Hampshire's practice, it would not affect the outcome of Parents' appeal.

¶58 Similar to New Hampshire, ICWA does not require evidence beyond a reasonable doubt in the manner Parents describe. But in contrast to New Hampshire, ICWA does not impose that standard at a stage in termination proceedings comparable to either Utah's parental-fitness or best-interests stages. Rather, ICWA requires evidence beyond a reasonable doubt only for a factual determination that physical or emotional harm to the child is likely to occur—a determination that is part of a procedural requirement that does not appear in Utah's statutory code.[33] Additionally, we note that Congress enacted ICWA for the specific and distinct purpose of preventing overreach by state adoption courts into the sovereignty of Native American tribes.[34] Because of these procedural and substantive differences, we do not find ICWA to be a fitting model for applying the "beyond a reasonable doubt" standard in termination proceedings under Utah law.

---

[32] The juvenile court noted that Parents both admitted to neglecting the children. Additionally, neither Parent has raised any arguments directly challenging the court's unfitness determination on appeal.

[33] 25 U.S.C. § 1912(f). Although Utah courts may rely on a finding of physical or emotional harm to conclude that a parent is unfit, this finding is only one of many statutory grounds for an unfitness determination. *See* UTAH CODE § 78A-6-507. So, at most, ICWA suggests that the "beyond a reasonable doubt" standard could be applied to a single ground for termination under Utah law—not to the entire termination analysis as Parents suggest.

[34] 25 U.S.C. § 1901(5) (explaining that Congress passed ICWA to combat states' "fail[ure] to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families" in termination proceedings involving members of federally recognized Indian tribes); *see generally State v. Native Vill. of Tanana*, 249 P.3d 734, 750 (Alaska 2011) ("[U]nless and until its powers are divested by Congress, a federally recognized sovereign Indian tribe has powers of self-government that include the inherent authority to regulate internal domestic relations among its members.").

¶59 Turning to Parents' argument regarding society's evolving understanding of childhood trauma, we are not convinced this factor weighs in their favor even were we to accept their assertions in this regard. Essentially, Parents argue that society's evolved understanding of childhood trauma requires us to be more careful before removing children from their parents. But this argument cuts both ways. Although removing children from their parents is often traumatic, leaving children in a neglectful or unsafe home may be equally traumatic or even physically dangerous.[35]

¶60 Finally, we reject Parents' argument regarding the resource imbalance between the State and parents in termination proceedings. Although Parents' resource-imbalance argument could be equally applicable in many other contexts, they assert that the informal nature of termination proceedings exacerbates the problem.[36] Specifically, they point to the fact that juvenile courts may consider evidence that is not typically admissible, such as reliable hearsay and opinions.[37] But we are not convinced that this or other informal aspects of juvenile court procedure exacerbate the resource problem.

¶61 It may be true, of course, that many parents lack the resources and legal expertise to effectively defend against termination on their own. In contrast, the State has many resources at its disposal, such as the information DCFS caseworkers collect when working closely with struggling families. But we do not agree that the informal aspects of termination proceedings exacerbate this

---

[35] *See generally* Heather A. Turner et al., *Child Neglect and the Broader Context of Child Victimization*, 24 CHILD MALTREATMENT 265 (2019) (finding that experiences with neglect and violence, "both inside and outside the family context," are associated with trauma symptoms).

[36] The Utah Rules of Juvenile Procedure state that "[d]isposition hearings shall be conducted in an informal manner to facilitate the opportunity for all participants to be heard." UTAH R. JUV. P. 46(a); *see also Interest of S.J.*, 576 P.2d 1280, 1283 (Utah 1978) ("[J]uvenile court proceedings are highly equitable in nature, designed to inquire into the welfare of children, are not adversary in the usual sense, and may be conducted in an informal manner. . . . This informality does not permit, however, the abridgement of basic constitutional provisions of due process." (footnote omitted)).

[37] *See* UTAH R. JUV. P. 46(b).

problem. In fact, it seems more likely that the informality of such proceedings may serve to lower the hurdle for legally unsophisticated parents by making it easier for them to introduce evidence and dispute the State's claims. In other words, it seems more likely that the informal nature of juvenile court would, if anything, help to ameliorate the resource imbalance between Utah parents and the State.[38] And even if this is not the case, the informal nature does not clearly benefit one side or the other.

¶62 Accordingly, even assuming the *Santosky* Court's concerns about the "beyond a reasonable doubt" standard are misplaced, Parents have not persuaded us that raising the standard of proof is warranted. So we decline their invitation to adopt the "beyond a reasonable doubt" standard.

¶63 Because the Utah legislature and this court have adopted the "clear and convincing" standard, and because we decline to raise that standard of proof in this case, we affirm the juvenile court's denial of Parents' joint motion to apply the "beyond a reasonable doubt" standard.

## II. We Did Not Create a New Standard of Review in *State ex rel. B.R.*

¶64 We now turn to Father's argument that *State ex rel. B.R.* created an impermissibly deferential standard of appellate review for juvenile court decisions. But, before reaching the substance of Father's argument, we first address the State's contention that Father's argument violates this court's briefing order. For the reasons discussed below, we disagree with that contention.

¶65 With respect to the merits of Father's argument, we conclude that he misinterprets our holding in *State ex rel. B.R.* as setting out a unique standard of deference for juvenile courts. To the contrary, our decision in *State ex rel. B.R.* reiterates the standard used in other cases. But even though we uphold the standard of appellate review used in our *State ex rel. B.R.* decision, we take this opportunity to emphasize the importance of carefully applying the

---

[38] Although we reject Parents' argument on this point, we note that the resource imbalance Parents identify is an important consideration. But there are or could be other policy considerations at play—considerations that could be foundational in existing Utah case law. Parents' failure in their briefs to adequately address existing Utah law in this regard is an additional reason for rejecting this policy argument in this case.

"clear and convincing" standard of proof in termination proceedings.

### A. Father's Argument Does Not Violate our Briefing Order

¶66 As noted, Father calls for us to overrule our decision in *State ex rel. B.R.* The State argues this is improper because Father did not explicitly request the court of appeals to overturn *State ex rel. B.R.* and our briefing order "clearly envision[s] only modifications to arguments already presented to the Court of Appeals." According to the State, replacement briefs are meant to "allow counsel to reformulate arguments already made before the Court of Appeals to reflect the new posture before this Court," not to allow counsel to bring "new legal theories never raised before the Court of Appeals." But the State cites no authority for this proposition and does not explain what effect this alleged violation would have on Father's position on appeal.

¶67 And even were we to accept the State's proposition, we are not convinced Father's inclusion of his argument regarding *State ex rel. B.R.* would be improper. This is because Father's brief can reasonably be read as merely reformulating his arguments to reflect the case's new posture before this court. Because the court of appeals is bound by our decision in *State ex rel. B.R.*, Father's effort to overturn *State ex rel. B.R.* before that court would have been futile. But when the case was certified to us, this argument became viable. For this reason, Father's inclusion of his *State ex rel. B.R.* argument is permissible. Accordingly, we address the merits of Father's argument.

### B. Father Misinterprets State ex rel. B.R.

¶68 Father argues that *State ex rel. B.R.* unintentionally articulated a standard of "super-deference" that disregards the "clear and convincing" standard of proof required in termination proceedings.[39] Although he concedes that *State ex rel. B.R.* is firmly established in Utah law, Father argues that it has effectively lowered the evidentiary standard in termination proceedings from "clear and convincing" to "a mere preponderance of the evidence or worse." He requests that we amend the standard of review we applied in *State ex rel. B.R.* to ensure juvenile courts support their conclusions with sufficiently convincing evidence. But, contrary to Father's assertions,

---

[39] 2007 UT 82, 171 P.3d 435.

we do not read *State ex rel. B.R.* as setting out a unique standard of review for juvenile courts.

¶69 As a central part of Father's argument, he interprets *State ex rel. B.R.* as forbidding appellate courts from overturning a termination order when *any* evidence supports the juvenile court's decision. But the standard of review we applied in *State ex rel. B.R.* is the same standard we have used in other cases.

¶70 For example, in *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, we explained that "[w]e review a trial court's factual findings for clear error and will overturn a factual finding only if it is against 'the clear weight of the evidence.'"[40] In comparison, in *State ex rel. B.R.*, we explained that "in order to overturn the juvenile court's decision [t]he result must be against the clear weight of the evidence or leave the appellate court with a firm and definite conviction that a mistake has been made."[41] So the standard we applied in *State ex rel. B.R.* is substantially similar to the standard of review we apply in other cases when reviewing a trial court's factual findings.

¶71 And this well-established standard of review is appropriate for reviewing factual findings of trial courts. As we explained in *Pagano v. Walker*, "it has long been established and reiterated by this court . . . that due to the advantaged position of the trial court we will review its findings and judgments with considerable indulgence."[42] So we "will not disagree with and upset [a trial court's findings] unless the evidence clearly preponderates against them, or the court has mistaken or misapplied the law."[43]

¶72 But although the standard of review we applied in *State ex rel. B.R.* is well established in our case law, Father takes issue with some additional language we employed in that case while discussing what a typical review of factual findings should look like. We explained that appellate courts may only overturn a juvenile court's decision (assuming the juvenile court correctly interpreted the law) "if [the juvenile court] either failed to consider all of the facts or

---

[40] 2009 UT 7, ¶ 11, 210 P.3d 263 (citation omitted) (internal quotation marks omitted).

[41] *State ex rel. B.R.*, 2007 UT 82, ¶ 12 (alteration in original) (citation omitted) (internal quotation marks omitted).

[42] 539 P.2d 452, 454 (Utah 1975).

[43] *Id.*

considered all of the facts and its decision was nonetheless against the clear weight of the evidence."[44] But this principle is also firmly established in our case law.[45] So Father has failed to show us how the *State ex rel. B.R.* standard differs from the standard we typically apply on appeal.[46]

¶73 In short, we are not convinced that we deviated from our longstanding principles of deference to trial courts in *State ex rel. B.R.*, let alone created a unique standard of super-deference for juvenile courts. But we take this opportunity to emphasize the importance of the "clear and convincing" standard of proof in termination proceedings. Although we defer to juvenile courts' factual determinations, in reviewing their conclusions we do so with an exacting focus on the proper evidentiary standard. In order that our court or the court of appeals might conduct the robust appellate review that a "clear and convincing" standard requires of us, it is

---

[44] *State ex rel. B.R.*, 2007 UT 82, ¶ 12.

[45] *See Tanner v. Baadsgaard*, 612 P.2d 345, 346 (Utah 1980) ("Where the evidence is in dispute, we assume that [the trial court] believed that which is favorable to [its] findings, and we do not disturb them unless [the evidence] clearly preponderates to the contrary."); *First W. Fid. v. Gibbons & Reed Co.*, 492 P.2d 132, 133 (Utah 1971), *abrogated on other grounds by Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618 (Utah 1989) ("Where the appellant's position is that the trial court erred in refusing to make certain findings essential to its right to recover, and insists that the evidence compels such findings, it is obliged to show that there is credible and uncontradicted evidence which proves those contended facts with such certainty that all reasonable minds must so find.").

[46] In *State ex rel. B.R.*, we stated that "an appellate court may not engage in a reweighing of the evidence" "[w]hen a foundation for the court's decision exists in the evidence." 2007 UT 82, ¶ 12. This sentence could give the impression that there is a uniquely deferential standard of review for juvenile courts. We disavow this sentence and any other language in *B.R.* so far as it suggests that there is a different standard of review for juvenile courts. When reviewing a fact-intensive mixed question of fact and law, such as whether a particular placement serves a child's best interests, appellate courts should use the same standard used in other cases: An appellate court must not overturn the trial court's decision unless it is against the clear weight of the evidence.

critical that juvenile courts thoroughly and transparently examine all of the relevant facts in determining whether that standard has been met. In conducting our appellate review, we will not only consider whether any relevant facts have been left out but assess whether the juvenile court's determination that the "clear and convincing" standard had been met goes against the clear weight of the evidence.

### III. The Court Did Not Err in Its "Strictly Necessary" Analysis

¶74 Finally, we address Parents' claim that the juvenile court erred in concluding that termination was strictly necessary and in the children's best interests. They argue that the court erred in two ways. First, Parents argue that the court's "strictly necessary" analysis was deficient because the court did not support its conclusion with findings regarding Grandmother's post-divorce financial circumstances. But, after reviewing the record, we disagree. Second, Parents argue that the court mistakenly relied on a provision of the Utah Human Services Code to inappropriately limit its "strictly necessary" analysis. But Parents have not carried their burden to adequately brief this issue, so we do not address it.

¶75 We interpreted the Termination of Parental Rights Act's "strictly necessary" requirement in *Interest of B.T.B*. There, we concluded that once statutory grounds for termination exist, "the court must determine if termination is strictly necessary for the welfare and best interest of the child."[47] And we explained that termination is not strictly necessary if a child can be "equally protected and benefited by an option other than termination."[48] But we also stated that "when the Legislature instructed [juvenile courts to] consider the welfare and best interest of the child of paramount importance, it elevated that consideration above all of the other important interests the Act identifies."[49] So when two placement options would equally benefit a child, the strictly-necessary requirement operates as a preference for a placement option that does not necessitate termination over an option that does.

¶76 Additionally, in making a "strictly necessary" determination, the Termination of Parental Rights Act imposes an

---

[47] *Interest of B.T.B.*, 2020 UT 60, ¶ 62, 472 P.3d 827, *reh'g granted* (Aug. 13, 2020), *as amended* (Aug. 14, 2020).

[48] *Id.* ¶ 66.

[49] *Id.* ¶ 61 n.13 (internal quotation marks omitted).

affirmative mandate for juvenile courts to "give full and careful consideration to all of the evidence presented with regard to the constitutional rights and claims of the parent."[50] So we look to the record to determine whether the juvenile court considered all of the evidence in determining that termination was strictly necessary and in the children's best interests.[51]

¶77 First, Parents argue that the court's "strictly necessary" analysis was deficient because the court did not consider Grandmother's improved financial circumstances following the resolution of her divorce proceeding which had been pending during trial. In their view, had the court considered Grandmother's post-divorce financial situation, it would have concluded that placing the children with her was a feasible alternative to terminating their parental rights. But after reviewing the record, we disagree. The court did in fact consider the possibility that Grandmother's financial situation would improve. And although the court could have given more detailed reasoning, it nevertheless made sufficient findings to meet its mandate to "give full and careful consideration to all of the evidence presented."[52]

¶78 The juvenile court's amended order indicates that Grandmother's financial circumstances were a point of discussion at trial. While caring for the children before trial, Grandmother failed to become a licensed foster parent despite DCFS's repeated requests that she do so. At trial, the court found that foster parent licensure "would have provided her and the . . . children with additional resources and helped them financially *until the funds from her divorce action became available*." (Emphasis added.) The court also found that Grandmother's failure to attain licensure "stem[med] from her wanting the children to go back with Parents" and "demonstrated that she ha[d] not fully focused upon the children's best interests and ha[d] neglected their needs." In making these findings, the court determined that Grandmother's failure to attain licensure spoke ill of

---

[50] UTAH CODE § 78A-6-506(3).

[51] *See Interest of C.C.W.*, 2019 UT App 34, ¶ 24, 440 P.3d 749 ("[T]he juvenile court never directly grappled with Father's violent history in its best interest analysis. . . . [W]e cannot construe the juvenile court's best-interest discussion as containing adequately articulated reasons for its decision.").

[52] UTAH CODE § 78A-6-506(3).

her fitness as a potential guardian. But the court's concerns about placing the children with her did not end there.

¶79 Ultimately, the court declined to place the children with Grandmother because of "her own admission that she cannot see herself caring for the children until each of them reaches adulthood." Moreover, "[e]ven if Grandmother could continue as the children's permanent custodian and guardian" long term, the court was troubled that she had arranged for unauthorized parental visits while the children were in her custody and testified at trial that she saw nothing wrong that. The court found that, in arranging these visits, Grandmother had demonstrated a lack of judgment, placed the children in potential danger, and "lost . . . credibility with the court." Based on this, the court concluded that it could not "be assured that [Grandmother] w[ould] not return the children to Parents," so permanent custody and guardianship with her was out of the question.

¶80 Following trial and the resolution of Grandmother's divorce proceeding, Parents filed a motion for a new trial for the court to consider the precise amount of money Grandmother would receive as a result of the divorce, which was unknown at the time of trial. But the court denied that motion because Parents had "not present[ed] anything new in their request for a new trial that would have altered the court's decision to terminate their parental rights." In other words, the evidence regarding the precise amount of money Grandmother was to receive would not have altered the court's reasoning about the feasibility of placing the children with her.

¶81 On appeal, Parents again fail to adequately challenge the court's reasoning regarding Grandmother—they do not attempt to excuse her lapses in judgment while the children were in her care. Instead, they claim that the court's "strictly necessary" analysis was deficient because the court did not admit and consider the evidence they presented after trial. Certainly the court could have made more detailed findings regarding Grandmother's financial ability to care for the children following her divorce. But neither the Termination of Parental Rights Act nor our decision in *Interest of B.T.B.* requires a juvenile court to consider supplemental evidence that merely elaborates on a factor the court already considered in its "strictly necessary" analysis—especially when that evidence does not address or refute the considerations on which the court relied to reach its conclusion.

¶82 From the record, it is clear that the court considered the possibility that Grandmother would be more financially capable of

caring for the children following her divorce. But that possibility did not affect the court's other concerns about placing the children in her care. And, following trial, the court denied Parents' motion for a new trial because none of the evidence "would have altered the court's decision." We conclude that the court fulfilled its affirmative mandate to "give full and careful consideration to all of the evidence presented" regarding Grandmother's finances.[53]

¶83 Second, Parents argue that the court mistakenly relied on a provision of the Utah Human Services Code to inappropriately limit its consideration of permanent guardianship placement options to placement with relatives of the children. In their view, the court should have considered permanent guardianship placement with the prospective adoptive parents as an alternative to terminating their parental rights. We reject this argument because Parents have failed to adequately brief it.

¶84 Under rule 24 of the Utah Rules of Appellate Procedure, an appellant "must explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal." We have stated that "this court is not a depository in which the appealing party may dump the burden of argument and research."[54] So to carry their burden under this rule, Parents must demonstrate that the juvenile court's reliance on a provision of the Human Services Code was error and that they should prevail on appeal. They fail to do so.

¶85 In its termination order, the juvenile court quoted section 62A-4a-205(9) of the Human Services Code, stating that "because [M.D.] is one-year old, Utah statutory law dictates that adoption is the only feasible option for her primary permanency goal: 'with regard to a child who is three years of age or younger, if the plan is not to return the child home, the primary permanency plan for that child shall be adoption.'" Parents cite this part of the court's order, arguing it was error because "Utah Code § 62A-4a-205(9) is a provision of the Utah Human Services Code, not the Juvenile Court Act." And, they argue, "[t]his provision does not absolve the juvenile court of its responsibility to consider the welfare

---

[53] *Id.*

[54] *State v. Gamblin*, 2000 UT 44, ¶ 6, 1 P.3d 1108 (quoting *State v. Jaeger*, 1999 UT 1, ¶ 31, 973 P.2d 404) (internal quotation marks omitted).

and best interest of the child of paramount importance." (Citation omitted.) (Internal quotation marks omitted.)

¶86 Central to Parents' argument is their assertion that the juvenile court should not have relied on the Human Services Code because it governs DCFS activity and does not apply to juvenile courts. But this assertion is inaccurate. In fact, section 62A-4a-205(9)(b) of the Human Services Code lays out the circumstances in which a court may order certain permanent living arrangements.[55]

¶87 Beyond this assertion, Parents argue that the statute governs M.D.'s "primary permanency plan," not the outcome of the termination proceeding. But they do not address the relevance of the children's primary permanency plan to the proceeding. Nor do they address whether the court could have permissibly relied on the statute to foreclose consideration of certain placement options for the children.

¶88 Moreover, although the record indicates that the court relied on the Human Services Code to some degree, Parents have not made clear the extent to which it did so. In its "strictly necessary" analysis, in addition to quoting the statute, the court considered the many opportunities Parents had to reform themselves. And based on those missed opportunities, the court concluded that it was "unwilling to gamble the children's safety, security, and stability by placing them in a permanent custody and guardianship arrangement." Parents have not addressed whether this portion of the court's reasoning also played a part in limiting the placement options it was willing to consider.

¶89 Without more elaboration, we cannot conclude that Parents have carried their burden to brief this issue. Parents' assertion that the Human Services Code governs DCFS activity does not sufficiently address the statute's potential relevance to a juvenile court's "strictly necessary" analysis. Further, Parents have not demonstrated that the court relied solely on this statute to limit its

---

[55] UTAH CODE § 62A-4a-205(9)(b) (2020) ("[I]f the division documents to the court that there is a compelling reason that adoption, reunification, guardianship, and a placement described in Subsection 78A-6-306(6)(e) are not in the child's best interest, *the court may order another planned permanent living arrangement* in accordance with federal law." (emphasis added)).

analysis. So we conclude that Parents have not carried their burden under rule 24.

## Conclusion

¶90 The juvenile court did not err in declining to apply the "beyond a reasonable doubt" standard of proof. And we decline to adopt that standard now because Parents have failed to overcome the weight of stare decisis in favor of the "clear and convincing" standard. We conclude that the court did not err in its "strictly necessary" analysis. The court adequately considered the possibility that Grandmother would be more financially capable of caring for the children following her divorce but nevertheless concluded that placement with her was infeasible for other reasons. And we do not address Parents' argument that the court erred in considering a provision from the Human Services Code in its analysis because Parents have not adequately briefed the issue. Accordingly, we affirm the juvenile court's termination order.

---