**2022 UT App 116**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF J.J.W.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

M.E.S. AND D.C.S.,
Appellees,
*v.*
J.V.W.,
Appellant.

Opinion
No. 20210706-CA
Filed October 14, 2022

Eighth District Court, Vernal Department
The Honorable Samuel P. Chiara
No. 163800064

Alexandra Mareschal, Attorney for Appellant

John D. Hancock, Attorney for Appellees

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and DAVID N.
MORTENSEN concurred.

HARRIS, Judge:

¶1      J.J.W.'s (Child) maternal grandmother (Grandmother) and
her husband filed a petition for adoption of Child, along with a
petition seeking the termination of the parental rights of child's
father, J.V.W (Father). After a bench trial, the district court found
that multiple statutory grounds for termination were present, and
that it was in Child's best interest for Father's rights to be
terminated. Father now appeals the court's best-interest
determination, asserting that the court's analysis was, at a
minimum, incomplete, because the court did not adequately
consider other possible options short of termination. We agree

with Father, and therefore vacate the court's termination order and remand for further proceedings consistent with this opinion.

BACKGROUND

¶2      Child—who was born in 2011—lived with his mother (Mother), his half-brother (Brother, who was Mother's child from a previous relationship), and Father in Vernal, Utah without relevant incident until 2016. By that point, Father and Mother—who both had a history of involvement with illegal drug use—had relapsed, and they made the voluntary decision to have both boys (collectively, the Children) go and live with Grandmother while they made an effort to get clean. They made this decision, in part, because they preferred to make their own choice regarding placement of the Children, and because they wished to avoid involving the state's Division of Child and Family Services, which they feared might separate the Children. They agreed to the entry of a court order placing the Children in the guardianship of Grandmother and a maternal uncle (Uncle). The guardianship order gave Father and Mother the right to three hours of parent-time each week. The general idea behind the guardianship—apparently shared by all involved at the time—was that the Children would be returned to Father and Mother if they were able to get clean. Indeed, Mother stated that, in her view, "the guardianship was more of a safety net" in case she and Father relapsed again.

¶3      Father and Mother made genuine efforts to improve their situation and, just a few months later, toward the end of 2016, Grandmother returned the Children to Father and Mother. For about the next year, the Children lived with Father and Mother without apparent incident.

¶4      Toward the end of 2017, however, Father and Mother relapsed again, and this led to problems in the home. For instance,

living conditions in the home had become substandard—the district court later found, in an unchallenged finding, that "the home was in [an] uninhabitable condition"—and the Children were missing a lot of school. On January 1, 2018, the Children returned to Grandmother's care, with the previous guardianship arrangement still in place. Father believed that, if he and Mother "could get some clean time, [they] would get the [C]hildren back" as they had before.

¶5     In 2018, shortly after the Children went to live with Grandmother for the second time, Father was charged with drug crimes and spent several months incarcerated. After his release, Father entered a sixty-day inpatient drug rehabilitation program in the Salt Lake area. After that, Father spent four months in "day treatment," during which time he spent some six hours per day in a combination of drug treatment programs and therapy. He then spent another few months in a nearby "sober living" situation, which included "aftercare" sessions with his treatment provider. He "coined out of all three" programs, meaning that he successfully completed them at the "highest" level; indeed, the district court later found that Father had "graduated with high honors from his drug treatment programs." He was also released from court-supervised probation some two years early, because the judge overseeing his criminal case recognized that Father had "satisfactorily complied with the conditions of" his probation.

¶6     During this time, however, Father had no contact—even telephonic or written contact—with Child at all. And Father did not attempt to make any financial contribution toward Child's care and well-being. At one point during his therapeutic process, Father reached out to Grandmother via text message to "let [her] know where [he] was in [his] therapy," but received no reply.

¶7     In February 2020, after completing his drug treatment programs, Father moved back to Vernal because he "wanted to be closer to where the kids were." At this point, Father was

apparently clean and drug-free, but was still working on obtaining a job and permanent housing. He reached out to Grandmother, in an attempt to start the process of reunifying with Child, but Grandmother resisted these efforts, telling him that "nothing was going to change" and that he was not allowed to see or even send gifts to the Children. Grandmother eventually stopped responding to Father's messages.

¶8     In August 2020, Grandmother and her husband (Grandparents) filed a petition to terminate all parents' rights to the Children, including—as relevant to this appeal—Father's rights with regard to Child.[1] Soon after receiving notice of the petition, Father moved to intervene in the case, and in addition filed a motion seeking to assert his three-hour-per-week parent-time that the 2016 guardianship agreement allowed. The court granted Father's motion to intervene but, upon Grandparents' request, deferred the hearing on Father's motion for parent-time and decided to combine it with the termination trial. As a result, Father was not afforded any parent-time during the pendency of the case, and by the time of trial he had not seen Child for over three years (since January 2018).

¶9     The district court held a one-day trial in August 2021 to consider Grandparents' petition. At trial, Grandparents testified and presented testimony from Uncle, Uncle's wife, and Father. In addition to presenting his own testimony, Father called Mother as a witness, as well as his own mother; he also attempted to call his current girlfriend, with whom he was living at the time of trial, but the court refused to allow her to testify because Father failed to list her in his pretrial disclosures.

---

1. Specifically, the petition sought to terminate Mother's rights to both Children, Father's rights to Child, and also the rights of Brother's father to Brother.

¶10    Grandmother testified that she considers the Children to be her own, believes they have a strong sibling bond, and feels that adoption is in their best interest because they "need and deserve [the] stability of a good home." Grandmother described the developmental delays Child was experiencing when he first came to live with her, explaining how he had trouble regulating his emotions and using his motor skills. She testified about how she is still working with Child to improve his motor skills by making him practice his handwriting and by playing Legos with him. And she testified that Child had never indicated any desire to have contact with Father and that whenever the possibility is mentioned "[h]e withdraws into himself," "rubs his hands together in a nervous motion," and "just kind of shuts down."

¶11    Grandmother's husband testified that he and Grandmother were financially able to provide for the Children and that the boys shared a close sibling bond. On cross-examination, he stated that he was open to letting Child see Mother and Father even if the adoption were approved, but also offered his view that it was in Child's best interest for Child "to stay at my place" rather than "bounce back and forth between" Grandparents' custody and his parents' custody.

¶12    Uncle, the co-guardian, then testified about the instances in which he and his wife picked up the Children from their home after the two relapses. He recalled that, during the 2016 removal, there was a "stench" in the house that made him want to vomit, and he described the situation as "wrecked squalor." He also recalled that, during the 2018 removal, there were mountains of moldy laundry and giant water stains on the laundry room floor, broken glass and some sort of oily liquid on the kitchen floor, and a sink overflowing with dishes and rotten food. He testified that, despite snow on the ground, the Children came outside in sandals with no coats. Uncle explained that he currently lives next door to, and shares a yard with, Grandparents, and that his children are more like siblings than cousins to Child. He also testified that

Child is actively involved in hockey and has thrived in Grandparents' care. Uncle's wife corroborated Uncle's testimony about the poor condition of the house during both pickups.

¶13   At the close of the evidentiary presentation, the district court made an oral ruling terminating Father's parental rights.[2] The court made extensive findings—generally not challenged here—that at least two statutory grounds for termination existed: abandonment and past neglect. In particular, the court found that Father had abandoned Child by failing to make sufficient efforts to communicate with him from January 2018 until at least August 2020. *See* Utah Code Ann. § 80-4-302(1)(b)–(c) (LexisNexis Supp. 2022) (stating that a parent's failure to communicate with a child "by mail, telephone, or otherwise for six months" constitutes "prima facie evidence of abandonment"). The court explained that abandonment also includes the failure "to show the normal interests of a natural parent without just cause," and concluded that Father's failure to provide for Child "emotionally [and] financially" and his lack of "attempts to communicate with [Child] for such a long period of time" constituted clear evidence of abandonment. The court also discussed Father's history of illegal drug use, and noted that Father's "continuous failure . . . since 2016 to provide [Child] with adequate food, clothing, shelter, and education" meant that Father had, during his relapses, been "unfit" and had "neglected [Child]."

¶14   After determining that statutory grounds for termination were present, the court turned to the question of whether termination of Father's parental rights was in Child's best interest. On this score, the court's analysis was not as extensive. During its

---

2. The court also terminated Mother's parental rights to both Children, as well as Brother's father's rights to Brother. Neither Mother nor Brother's father appeals the court's termination order, and therefore the court's termination orders as to those other individuals are not at issue in this appeal.

oral ruling, the court commented that the Children "were in really bad shape" when they came to live with Grandmother, and noted that "they are now in good condition." The court offered "kudos" to Father "for the incredible amount of effort" he had made "to try and sort things out," but noted that Father had been clean once before "for a period of five years" (from 2011 through 2016) and yet had nevertheless later "relapsed." The court offered its view that "the biggest risk" in the case "would be that I flip-flop their current custody, that I create a situation where they eventually go back into the custody of these parents, and then they end up being neglected and abused again." The court concluded that the Children "are in a safe home where they are healthy and well cared for," and that it is "in their best interest to not be exposed to the abuse and neglect that they faced several years ago."

¶15   The court also determined that "termination of parental rights [was] strictly necessary," stating that "the reason that it's strictly necessary is that, if I don't terminate the parental rights in this case, then the adoption cannot go forward. And the adoption is in the best interest of the children . . . so that they can have permanency in their life." The court commented that the "stability" of Father's living situation was "questionable" because "he's not even paying rent in the home that he lives in right now" and that "[h]e has no rights to that home" because "he's not married to the person that he's with and so I don't know how stable that relationship is."

¶16   In its written ruling, which followed the oral ruling, the court made a factual finding—somewhat at odds with its oral ruling[3]—that Father's "situation is stable and because of his living situation he is not required to pay rent." And the court's best-

---

3. "Where a court's oral ruling differs from a final written order, the latter controls." *Haskell v. Wakefield & Assocs. Inc.*, 2021 UT App 123, ¶ 19, 500 P.3d 950 (quotation simplified).

interest analysis consisted of a single paragraph, set forth here in its entirety:

> The Court finds that the [C]hildren were in really bad shape in 2016 before [Grandparents] assumed care of the [C]hildren. The Court finds that the [C]hildren were again in really bad shape in 2018 before [Grandparents] assumed care of the [C]hildren for the second time. The [C]hildren are now happy, well adjusted, well cared for and their needs are being met. The biggest risk to [the Children] is if the Court make[s] a decision that puts the [C]hildren at risk of going through what they have gone through again. The Court concludes that it is in the [C]hildren's best interest that the parental rights of the natural parents be terminated. The termination of the parental rights is strictly necessary and it is in the best interests of the [C]hildren that they be adopted by [Grandparents]. If the Court does not terminate parental rights the adoption cannot occur. The Court will not create a situation where the [C]hildren may be bounced back and forth between different homes.

## ISSUE AND STANDARD OF REVIEW

¶17 Father appeals the district court's order terminating his parental rights, but does not challenge the court's determination that statutory grounds for termination exist here. Instead, Father limits his challenge to the court's best-interest analysis. In particular, he takes issue with the court's conclusion that termination of his parental rights was "strictly necessary" to further Child's best interest, and with the court's apparent failure to assess whether a permanent guardianship with Grandparents would serve Child's best interest as well as adoption would.

¶18 We review deferentially a lower court's best-interest determination, and will overturn it "only if it either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence." *In re E.R.*, 2021 UT 36, ¶ 31, 496 P.3d 58 (quotation simplified). But we do not afford "a high degree of deference" to such determinations; rather, we simply apply "the same level of deference given to all lower court findings of fact and 'fact-like' determinations of mixed questions," *id.* ¶¶ 29, 30, and follow the "clear and convincing standard of proof" that is the relevant evidentiary standard in termination of parental rights cases, *see In re G.D.*, 2021 UT 19, ¶ 73, 491 P.3d 867.

ANALYSIS

I. Preservation

¶19 Before addressing the merits of Father's challenge to the district court's best-interest analysis, we must consider Grandparents' assertion that Father failed to adequately preserve for appellate review the issue of whether a permanent guardianship arrangement would serve Child's best interest at least as well as adoption would. In particular, Grandparents point out that Father did not make a specific request for the court to consider permanent guardianship as an alternative option. We acknowledge that it would have perhaps been better if Father had more expressly asked the court to consider particular enumerated options short of termination, and we agree with Grandparents that, in some instances (e.g., where the existence of a particular option would not be readily apparent to the court), a parent may need to expressly ask a trial court to consider a specific non-termination option in order to properly preserve the right to argue, on appeal, that the court did not adequately consider that option. But on the facts presented here, we find Grandparents' preservation arguments unpersuasive.

¶20   As an initial matter, it is important to remember that Grandparents—as the petitioners—bear the burden of proof on all elements of their termination request, including the best-interest question. *See In re G.D.*, 2021 UT 19, ¶ 43, 491 P.3d 867 (stating that "petitioners in termination proceedings must prove termination is warranted"). In this context, Grandparents bear the burden of—among other things—demonstrating that termination of Father's parental rights was strictly necessary to serve Child's best interest. And as part of that showing, Grandparents must demonstrate that no other option short of termination would serve Child's best interest as well as termination would. *See In re B.T.B.*, 2020 UT 60, ¶ 66, 472 P.3d 827 ("If the child can be equally protected and benefited by an option other than termination, termination is not strictly necessary.").

¶21   Moreover, in assessing best interest, a court is obligated to "consider whether other less-permanent arrangements might serve the child's needs just as well" as termination would. *Id.* ¶ 67 (quotation simplified). As we discuss more fully below, courts that order termination of parental rights without appropriately exploring "feasible alternatives to termination" have not properly applied the second part of the two-part termination test. *See In re H.F.*, 2019 UT App 204, ¶ 17, 455 P.3d 1098 (reversing and remanding a juvenile court's termination order because, among other things, "the court's determination that termination was strictly necessary was not supported by an appropriate exploration of feasible alternatives to termination").

¶22   In this case, the court was—or, at a minimum, certainly should have been—aware of the existence of a viable alternative guardianship option: after all, Child had been living with Grandmother pursuant to a court-ordered guardianship arrangement off and on since 2016. At the time of trial, a guardianship arrangement was the status quo; indeed, Father had filed a motion—still pending as of the time of trial—seeking to enforce the parent-time provisions of the court's guardianship

order. In this situation, for Grandparents' petition to succeed, they needed to persuade the court to alter that status quo, upset the guardianship arrangement that was then in place, terminate the parents' rights, and facilitate an adoption. Any grant of that petition would therefore have to be accompanied by at least an implicit rejection of a guardianship alternative.

¶23　Under these circumstances, the question of whether a permanent guardianship arrangement with Grandparents might serve Child's best interest as well as adoption was necessarily presented to the court. *See In re D.B.*, 2012 UT 65, ¶ 17, 289 P.3d 459 (stating that "an issue is preserved for appeal when it has been presented to the court in such a way that the court has an opportunity to rule on it" (quotation simplified)). On these facts, we discern no preservation infirmity, and therefore do not view this as an appropriate case for exercise of our discretionary preservation requirement. *See Fort Pierce Indus. Park Phases II, III, & IV Owners Ass'n v. Shakespeare*, 2016 UT 28, ¶ 13, 379 P.3d 1218 (stating that "our preservation requirement is self-imposed and is therefore one of prudence rather than jurisdiction," and that appellate courts "exercise wide discretion when deciding whether to entertain or reject matters that are first raised on appeal" (quotation simplified)).

## II.  Best Interest and Strict Necessity

¶24　Next, we proceed to address the merits of Father's challenge to the district court's termination order. Before terminating a parent's rights, a court must be satisfied that both parts of a two-part test are met. First, the court must find that one or more statutory grounds for termination are present. *See* Utah Code Ann. § 80-4-301 (LexisNexis Supp. 2022). In this case, the court found that at least two such statutory grounds were present—abandonment and past neglect—and Father does not challenge the court's findings in that regard.

¶25 But Father does challenge the court's determination with regard to the second part of the test: that termination of his parental rights was in Child's best interest. *See In re B.T.B.*, 2020 UT 60, ¶¶ 19–20, 472 P.3d 827. Specifically, Father challenges that determination as being, at a minimum, incomplete, asserting that the district court did not adequately explore potential options short of termination that might serve Child's best interest just as well as termination would. On this point, we agree with Father.

¶26 The best-interest inquiry is "wide-ranging" and "asks a court to weigh the entirety of the circumstances" of a child's situation, including "the physical, intellectual, social, moral, and educational training and general welfare and happiness of the child." *See In re J.M.*, 2020 UT App 52, ¶¶ 35, 37, 463 P.3d 66 (quotation simplified); *see also In re H.F.*, 2019 UT App 204, ¶ 14, 455 P.3d 1098 ("The 'best-interest' test is broad, and is intended as a holistic examination of all the relevant circumstances that might affect a child's situation." (quotation simplified)).

¶27 Our legislature has provided two related pieces of important guidance on the best-interest question. *See In re A.H.*, 2022 UT App 114, ¶¶ 35–36. First, it has expressed a strong preference for families to remain together, stating that "[i]t is in the best interest and welfare of a child to be raised under the care and supervision of the child's natural parents" and that "[a] child's need for a normal family life in a permanent home, and for positive, nurturing family relationships is usually best met by the child's natural parents." *See* Utah Code Ann. § 80-4-104(8) (LexisNexis Supp. 2022).

¶28 Second, our legislature has mandated that termination of parental rights is permissible only when such termination is "strictly necessary." *See id.* § 80-4-301(1). Our supreme court has interpreted this statutory requirement to mean that "termination must be strictly necessary to promote the child's best interest." *See In re B.T.B.*, 2020 UT 60, ¶ 60. Indeed, a court's inquiry into the

strict necessity of termination should take place as part of the best-interest inquiry that comprises the second part of the termination test. *See id.* ¶ 76 (stating that, "as part of [the best-interest inquiry], a court must specifically address whether termination is strictly necessary to promote the child's welfare and best interest").

¶29 Our legislature further requires courts, when examining the necessity of termination, to consider whether "sufficient efforts were dedicated to reunification" of the family, and whether "the efforts to place the child with kin who have, or are willing to come forward to care for the child, were given due weight." *See* Utah Code Ann. § 80-4-104(12)(b)(i)–(ii). And our supreme court, interpreting this requirement, has made clear that

> this part of the inquiry also requires courts to explore whether other feasible options exist that could address the specific problems or issues facing the family, short of imposing the ultimate remedy of terminating the parent's rights. In some cases, alternatives will be few and unsatisfactory, and termination of the parent's rights will be the option that is in the child's best interest. But in other cases, courts should consider whether other less-permanent arrangements might serve the child's needs just as well.

*In re B.T.B.*, 2020 UT 60, ¶ 67 (quotation simplified). Indeed, courts "must start the best interest analysis from the legislatively mandated position that wherever possible, family life should be strengthened and preserved," and "[i]f the child can be equally protected and benefited by an option other than termination, termination is not strictly necessary." *Id.* ¶ 66 (quotation simplified); *see also In re B.T.B.*, 2018 UT App 157, ¶ 55, 436 P.3d 206 (stating that "if there is a practical way to keep parents involved in the children's lives that is not contrary to the children's best interests, a court should seriously consider such an

option"), *aff'd*, 2020 UT 60. As noted, courts that order termination of parental rights without appropriately exploring "feasible alternatives to termination" have failed to properly apply the second part of the test. *See In re H.F.*, 2019 UT App 204, ¶ 17.

¶30   In making its best-interest determination, the court did discuss—at least during its oral ruling—one potential alternative to termination: returning Child to Father's custody. In its oral ruling, the court was complimentary of Father's efforts to overcome his substance use problems, but nevertheless offered its view that Father's current living situation was too unstable, and the risk of Father experiencing a relapse too high, to warrant returning Child to Father's care. In its written ruling, however, the court made a contradictory finding regarding Father's stability—finding that his "situation [was] stable"—but otherwise offered no specific discussion, findings, or conclusions about Father's current ability to care for Child. This is problematic. A parent who has, in the past, neglected or abandoned his or her child has certainly committed actions that constitute statutory grounds for termination. But it no longer follows "almost automatically" therefrom that it is in the best interest of the child to terminate the parent's rights. *See In re B.T.B.*, 2020 UT 60, ¶ 80 ("The court of appeals did not err in disavowing the almost automatically language in its case law."). Especially in cases (like this one) initiated by private petition, it is important for courts to carefully assess a parent's efforts to improve and, if the court remains unpersuaded that the parent's situation has sufficiently changed for the better, to specifically set forth reasons why it remains unpersuaded, in addition to reasons—which may be related— why it is in the child's best interest not to be returned to the parent. *See id.* ¶ 71. While there may be a basis in this record for the district court to have rejected Father's position with regard to this alternative, *see In re J.M.*, 2020 UT App 52, ¶¶ 37–42, 463 P.3d 66 (upholding a court's refusal to return custody to a parent under similar circumstances), the court here—by focusing largely on Father's past actions rather than the current situation, and then by

making contradictory findings about Father's current situation—did not adequately explain itself.

¶31 Even more problematic, however, is the court's failure to expressly consider or even discuss—either in its oral or written ruling—the other obvious option: entering a permanent custody and guardianship order in favor of Grandparents.[4] This option would have simply continued some version of the status quo then in place. Under this option, Grandmother (with, perhaps, her husband or Uncle as co-guardian) would continue to serve as Child's legal guardian and Child would continue to live under her care, but Father could—pursuant to the terms of the guardianship order, as determined and supervised by the court—retain the right to maintain a relationship with Child, including perhaps exercise of an appropriate amount of parent-time. This option has the benefit of preserving the familial relationships, as our legislature has commanded courts to do "wherever possible." *See* Utah Code Ann. § 80-4-104(12) (stating that "[w]herever possible, family life should be strengthened and preserved"). And this option does have certain hallmarks of permanency; after all, a parent whose child has been placed in a permanent guardianship arrangement in a child welfare proceeding has no independent right to petition to change or dissolve the guardianship. *See id.* § 78A-6-357(3)(d) (LexisNexis Supp. 2022). Only the guardian has

---

4. Grandparents argue that the district court *did* consider this alternative, at least implicitly. They point out that the court rejected "[a]ny scenario that included a possibility that the [C]hildren be returned" to Father, a conclusion they interpret as implicitly rejecting the guardianship option. As noted in our preservation analysis, we agree with Grandparents that the court necessarily had to at least implicitly reject the status quo guardianship option. But there is no getting around the fact that the district court did not ever expressly consider or discuss this option at all, let alone offer any reasons for rejecting it. And it is this lack of express reasoning that we consider problematic.

that right. *Id.* And we are aware of no evidence in the record that would lead us to believe that Grandparents would be particularly susceptible to undue influence from Father as concerns seeking a change or dissolution of the guardianship.

¶32   As noted above, the court by necessity had to (at least implicitly) reject this option in order to grant Grandparents' petition for adoption and termination. But it made no effort to explain why it rejected that option, or why it might have believed that termination better served Child's best interest than guardianship did. And our supreme court requires courts to provide such an explanation "on the record." *See In re B.T.B.*, 2020 UT 60, ¶ 74 (stating that the "strictly necessary" statutory language "requires the court to find, on the record, that no other option can achieve the same welfare and best interest for the child" as termination can). And the "strictly necessary" requirement is especially important here, both because private termination cases "lack many of the parental protections that are built into the process when the State seeks termination of parental rights," and because "the best interest analysis may be the only real opportunity for the court to consider whether something short of termination would serve the child's welfare and best interest." *See id.* ¶ 71.

¶33   Grandparents defend the district court's ruling by pointing to the court's comments regarding stability. As noted, the court determined that the Children need stability, offered its view (at least in its oral ruling) that Father's living situation was unstable and that there continued to be a risk of drug relapse, and concluded that adoption was the option that provided the highest level of stability. In its written ruling, the court concluded that termination was "strictly necessary" because "[i]f the Court does not terminate parental rights the adoption cannot occur." But in this case, where another valid and available option exists, this reasoning is insufficient.

¶34 Our supreme court has recently clarified that the mere fact that adoptions—as a category—provide more permanency and stability than guardianships do is not enough to satisfy the statutory "strictly necessary" standard. *See In re J.A.L.*, 2022 UT 12, ¶ 24, 506 P.3d 606. In that case, the court held that the lower court

> fell into legal error in concluding that [a guardianship option] would not provide the "same degree of permanency as an adoption." That is not the question under our law. A permanent guardianship by definition does not offer the same degree of permanency as an adoption. And there is always some risk that the permanent guardianship could come to an end, or be affected by visitation by the parent. If these categorical concerns were enough, termination and adoption would be strictly necessary across the board. But such categorical analysis is not in line with the statutory standard.

*Id.* The court then noted that, as part of the "strictly necessary" analysis, a court "must assess whether a permanent guardianship can equally protect and benefit the children in the case before it." *Id.* ¶ 25 (quotation simplified). The court made clear that the statutory requirements were "not met by the categorical concern that a permanent guardianship is not as stable or permanent as an adoption," and instead "require[] analysis of the particularized circumstances of the case before the court." *Id.*

¶35 The situation presented here is even more concerning than the situation presented in *In re J.A.L.* In that case, the court at least discussed the possibility of a guardianship, but dismissed that option because it was not as permanent as an adoption. *See id.* ¶ 23. As noted, our supreme court deemed that reasoning insufficient. But here, the court did not even discuss the possibility of imposing a permanent guardianship arrangement; instead, it made only general references to permanence and

stability. It made no effort to explain—even using the thin reasoning offered by the trial court in *In re J.A.L.*—why a guardianship option would not further Child's best interest. These generalized comments are simply insufficient to explain why termination of Father's parental rights is strictly necessary to further Child's best interest.

¶36   In order to adequately assess strict necessity in these circumstances, the district court must directly confront this question: why does adoption and termination of Father's parental rights better further Child's best interest than a permanent guardianship option? In particular, before it may terminate Father's rights, the court must adequately explain why it is better for Child to have Father cut out of his life forever than to have Father remain involved in his life, perhaps with limited parent-time, pursuant to a guardianship arrangement.[5] And the court should approach these questions "from the child's point of view," rather than from Grandparents' or Father's point of view. *See In re B.T.B.*, 2020 UT 60, ¶ 64; *see also* Utah Code Ann. § 80-4-301(1) (instructing that the "strictly necessary" inquiry should be undertaken "from the child's point of view"). After all, courts may permanently separate families only if it is strictly necessary to do so; if both adoption and guardianship equally serve a child's best interest, then termination of the parent's rights is not strictly necessary. *See In re B.T.B.*, 2020 UT 60, ¶ 66 ("If the child can be

---

5. In this vein, the court should also consider the fact that Mother—despite the fact that her parental rights have been terminated in a ruling she does not appeal—will very likely have some role in the Children's lives going forward, simply by virtue of her biological relation to Grandmother, while Father—if his rights are terminated—is unlikely to be afforded the same opportunity. Indeed, we suspect that these factual realities had something to do with the fact that Father (but not Mother) went to the effort and expense of filing an appeal. On remand, among other things, the court should consider and discuss these realities.

equally protected and benefited by an option other than termination, [then] termination is not strictly necessary."); *accord In re A.H.*, 2022 UT App 114, ¶ 48.

CONCLUSION

¶37 The district court fell into legal error when it failed to expressly consider other apparent reasonable options short of termination that might serve Child's best interest just as well. In particular, the court erred by failing to explain, on the record, why a permanent custody and guardianship arrangement with Grandparents could not serve Child's best interest, and why termination of Father's parental rights—as opposed to imposition of a guardianship—was strictly necessary to further that interest. We therefore vacate the district court's termination order and remand the case for a renewed best-interest analysis.

¶38 In so doing, we offer two items of guidance that we hope will be helpful on remand. First, we emphasize that this is not a weight-of-the-evidence reversal, but simply a remand for completion of the analysis. Nothing in this opinion should be construed as this court having placed its thumb on the scale of how that analysis should come out, and we of course offer no opinion in that regard. Second, we emphasize—as we have before, *see In re Z.C.W.*, 2021 UT App 98, ¶¶ 14–15, 500 P.3d 94— that the best-interest analysis on remand should be conducted in present-tense fashion, as of the date of the hearing or trial, and should not only take into account the items discussed in this opinion but, in addition, should take into account, in some form, any material developments with regard to Child that have occurred since the last trial.

---