2023 UT App 98

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF D.S. AND K.S.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

S.S.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20220956-CA
Filed August 31, 2023

Third District Juvenile Court, Salt Lake Department
The Honorable Annette Jan
No. 1198250

Sheleigh A. Harding, Attorney for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and
John M. Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1     After a trial, the juvenile court terminated S.S.'s (Father) parental rights regarding his two children, D.S. and K.S. (collectively, the Children), concluding that it was in the best interest of the Children for them to be adopted by their paternal grandmother (Grandmother). Father appeals the court's termination order, asserting that—under the precise circumstances presented here, where the Children are being placed with Father's own mother and where permanent

guardianship remains a viable option—termination of his rights was not strictly necessary to promote the best interest of the Children. We agree with Father, and reverse the juvenile court's termination order.

BACKGROUND

¶2    Father is the biological father of K.S., a boy born in 2010, and D.S., a girl born in 2016. Father resided with the Children and their mother (Mother) from the time the Children were born until approximately 2018. In 2014, the Division of Child and Family Services (DCFS) received a report that Father had committed "Domestic Violence related child abuse" against K.S. and some of the Children's other siblings; most notably, the report alleged that Father had "cut [a sibling's] hand with a knife." DCFS found the allegations "supported," but it did not take action to remove K.S. at that time, and no criminal charges were ever filed.

¶3    Around 2017, after D.S. was born, a protective order was entered against Father, for reasons unclear from this record, that restricted his ability to contact Mother. Even after entry of the protective order, though, Father continued to reside with Mother for about another year, in apparent violation of that order. Eventually, in 2018, Father and Mother went through "a messy break up" and separated; the Children remained in Mother's custody. In the year following the separation, Father spent time with the Children on a regular basis through "weekend visits" that Grandmother initiated and staged at her house.

¶4    During this time period, Father was arrested for "possession of a dangerous weapon"—"a pocketknife in [his] pocket"—in connection with various "protective order violations." In late 2019, he was sentenced to prison, and ordered to serve a term of zero to five years. When Father first got to prison, he was unable to visit with the Children—even virtually—due to the continued existence of the protective order, but in

March 2020, after obtaining a modification to that order, he began visiting with the Children through weekly "video visits" or "phone visits." In the beginning, it was Grandmother who "was really insistent" that these virtual visits take place between Father and the Children. And since 2020, such visits have occurred on more or less a weekly basis.

¶5    In early 2021, while Father was still incarcerated, the Children were removed from Mother's custody after an incident in which Mother abandoned them. The Children were later adjudicated neglected as to Mother and dependent as to Father, and the juvenile court placed them with Grandmother. In later proceedings, Mother's parental rights were terminated, a determination Mother has not appealed. And due to Father's ongoing incarceration, reunification services were never offered to him; the juvenile court set a permanency goal of adoption.

¶6    In January 2022, the State filed a petition seeking to terminate Father's parental rights regarding the Children. Prior to trial on that petition, Father stipulated that—largely due to his incarceration—the State could show at least one statutory ground for termination of his parental rights. But the case proceeded to trial on the other element of the termination test: whether termination was strictly necessary to promote the best interest of the Children. On that point, Father took the position that termination of his rights was not strictly necessary, given that—at least in his view—he had a good relationship with the Children, they were in the care of his own mother (Grandmother), and he would undoubtedly be a part of their lives going forward, at least in some sense, simply due to that reality. He asserted that a permanent custody and guardianship arrangement would suit this situation better than adoption would.

¶7    In August 2022, the juvenile court held a relatively brief trial to consider that issue; during that trial, the court heard argument from counsel and testimony from three witnesses: the

DCFS caseworker (Caseworker), Grandmother, and Father.[1] Caseworker testified that the Children were doing well in Grandmother's care. She was aware that the Children have regular virtual visits with Father, but she noted that the Children "don't talk [with her] much about" those visits and, when they do, they often just say "they don't remember what they talked [with Father] about." Caseworker stated that she knows that the Children "love [Father]," and did not recall either of them ever saying that they found Father "scary." But she offered her view that adoption by Grandmother was in the Children's best interest, opining that "adoption is necessary to allow them permanency and . . . a long-lasting, stable environment." She also stated that she had talked to the Children "about adoption" and that the Children "would like to be adopted by [Grandmother]," but did not elaborate or offer any context for this conversation.

¶8 Grandmother testified that the Children were doing well in school and thriving in her care. She acknowledged that, as a general matter, "fathers are important" in the lives of children, and she stated that she had been "a big advocate for" Father throughout the entire saga, even pushing to set up virtual visits from the prison after Father was first incarcerated. But she testified that, over time, she had become more of "an advocate for the [Children]," and offered her view that, due to some of the "choice[s]" Father had made, the relationship between Father and the Children had not "functioned properly for a very long time." She discussed, at some length, the regular virtual visits that the Children have with Father, and she acknowledged that Father is a good listener during the visits. But she stated that the Children have lost interest in the visits over time, and that the visits are "hard for" the Children and make them "uncomfortable" because "they don't know what to do" during the visits. To cope with the discomfort, Grandmother has added some "structure[]" to the

---

1. The trial transcript is composed of just fifty-two pages. And the three witnesses' testimony, in total, took just over an hour.

visits "so that [the Children] would have things to talk about"; for instance, K.S. often plays the piano for Father during the visits, while D.S. often "plays kitchen" and pretends to cook things for Father. Grandmother offered her perception that the Children do not wish to have regular virtual visits anymore, and that Father does not understand that the visits are hard for the Children. She noted that sometimes the Children need to "spend some time kind of snuggling" with her after the visits. Grandmother also testified that, on at least one occasion, K.S. said that Father is "scary."

¶9      Grandmother testified that she is ready, willing, and able to continue caring for the Children. But she voiced a strong preference for adopting them rather than acting as their permanent guardian. When asked why, she offered her view that adoption would be "less confusing" for the Children and that she could be "a consistent parent" for them given her "resources." She opined that a guardianship arrangement "may suit [Father]," but she didn't think it was "in the [C]hildren's best interests." She also stated that she was worried about what would happen to the Children—and, specifically, whether they would return to Father's custody—if something were to happen to her. She acknowledged, however, that she would be willing to care for the Children in either form of custody (adoption or guardianship). And she also acknowledged that, even if Father's parental rights were terminated and she were allowed to adopt the Children, she would nevertheless be open to the possibility that Father could still have a role in the Children's lives, and in that situation she would "ask for some guidance from people that know more than [she does] about that," such as the Children's therapist. She testified that she had discussed the possibility of adoption with the Children, and that D.S. had compared it to those "commercials on TV about adopting a dog." Referring to that comment, Grandmother acknowledged that the Children "have some misconceptions about" what adoption would mean and stated that she had "tried to fix" those misconceptions, but she offered no specifics about how she had attempted to do that.

¶10   Father was the trial's final witness. In his testimony, he first described the involvement he has had in the Children's lives since their birth, stating that when the family was living together he saw the Children every day, "took them to school, [and] everything." Father acknowledged that the situation had changed due to his incarceration, and he recognized that the virtual visits from prison are "not ideal" because there are often other inmates in the background on video calls and because the technology sometimes has issues, but overall, he offered his view that the visits had been going well and that he did not think the visits were uncomfortable for the Children. As he perceived it, the Children "seem[ed] excited to see" him and "always tell [him] they love" him. He credited the virtual visits for allowing him to "maintain a relationship with" the Children despite his incarceration. He stated that he had "a really good bond" with K.S., with whom he shares a connection to music. He also spoke positively of his visits with D.S., although he acknowledged that D.S. sometimes "gets upset because [Father] can't be there with her" in person.

¶11   Father testified that he was scheduled to be released from prison in December 2022, and he articulated a desire to "have a stronger relationship with" the Children than he was able to enjoy during incarceration. Father acknowledged that, immediately upon his release from prison, he would be in no position to assume custody of the Children, because he would "have a lot of stuff to deal with," like "getting a job," addressing his housing situation, and sorting out outstanding "immigration" issues.[2] But he was vocal about wanting to continue and improve his relationship with the Children after his release from prison.

---

2. The record submitted to us does not indicate whether Father was in fact released from prison on the anticipated date or, if so, whether Father has taken any steps to resolve his employment, housing, or immigration issues.

¶12 After the presentation of evidence, the attorneys made closing arguments. The juvenile court did not make any ruling on the record at the close of the trial; instead, it asked the parties to submit additional briefing on "the issue of strictly necessary." A few weeks later, the parties submitted those supplemental briefs, and thereafter the court issued a written ruling terminating Father's parental rights.

¶13 Because Father had conceded the existence of statutory grounds for termination, the only issue the court needed to address was whether termination of Father's rights was in the best interest of the Children and, as part of that inquiry, whether termination was strictly necessary to promote the Children's best interest. And on that score, the court concluded that termination was indeed strictly necessary. The court acknowledged that both Father and Grandmother love the Children. The court also acknowledged that "there were no allegations of abuse and neglect regarding [Father] at the time the [C]hildren were ordered into" the custody of DCFS.[3] But the court found that Father's "ability to offer love, affection, [and] guidance, and to continue with the [C]hildren's education is very limited both due to his incarceration and [the Children's] resistance to engaging with" Father. The court noted that the Children "have had stability" with Grandmother and were doing well in her care. The court also referenced its belief that the Children "desire to remain with and be adopted" by Grandmother, but it made no determination that the Children were of sufficient capacity to be able to meaningfully express their desires in this context.

---

3. At no point in its written ruling, or at any other time during the trial, did the court reference the 2014 "supported" allegations of abuse regarding the Children's sibling. No witness testified about those allegations at trial. And while the protective order violations were mentioned in passing, no witness offered any testimony about the basis upon which the protective order was granted.

¶14 In addition, the court opined that adoption was "necessary and essential to [the Children's] well-being as it will protect them from [Father's] desire to have ongoing and frequent visitation." The court chided Father for failing "to recognize that the [C]hildren . . . do not want to visit with him," and concluded that this failure "raises questions as to whether [Father] could act in the [C]hildren's best interest." In the court's view, the fact that Father "believes [the Children] enjoy the visits" and that he "would, ideally, exercise more visitation [after release from prison] is exactly why a permanent custody and guardianship neither protects nor benefits the [C]hildren." The court stated that a guardianship arrangement would "fail to ensure adequate protections against [Father's] commitment for increased and continued visitation," and would leave the Children "vulnerable to [Father's] residual parental rights." Indeed, the court observed that, "under a permanent custody and guardianship order," the Children's "emotional and physical needs" would be "subsumed by [Father's] residual rights." The court offered its view that adoption would serve the Children's needs better than guardianship would, because it "affords them the protection of ensuring that any future assessment of contact with [Father] will [be] considered solely from their respective points of view." The court stated that, "[i]f the legal assessment for best interest and strictly necessary was from the parental perspective, permanent custody and guardianship with [Grandmother] would likely [be] the best solution." But it observed that "the legal assessment of best interest and strictly necessary is focused solely upon the [C]hildren and their needs" and, viewing the situation from that perspective, the court concluded that termination of Father's rights was strictly necessary to promote their best interest.

## ISSUE AND STANDARD OF REVIEW

¶15 Father appeals the juvenile court's termination order, and challenges the court's conclusion that termination of his parental

rights was strictly necessary to further the Children's best interest. "We review a lower court's best interest determination deferentially, and we will overturn it only if it either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence." *In re A.H.*, 2022 UT App 114, ¶ 30, 518 P.3d 993 (quotation simplified), *cert. granted*, 525 P.3d 1279 (Utah 2023). But "we do not afford a high degree of deference to such determinations; rather, we simply apply the same level of deference given to all lower court findings of fact and fact-like determinations of mixed questions." *Id.* (quotation simplified). Moreover, because the "evidentiary standard applicable in termination of parental rights cases" is "the clear and convincing evidence standard," we will "assess whether the juvenile court's determination that the clear and convincing standard had been met goes against the clear weight of the evidence." *Id.* (quotation simplified); *see also In re G.D.*, 2021 UT 19, ¶ 37, 491 P.3d 867 ("Whether the juvenile court correctly concluded there was no feasible alternative to terminating . . . [the father's] parental rights is a mixed question of fact and law," and "we review the juvenile court's findings of fact for clear error and its conclusions of law for correctness, affording the court some discretion in applying the law to the facts." (quotation simplified)).

ANALYSIS

¶16    "The right of parents to raise their children is one of the most important rights any person enjoys." *In re A.H.*, 2022 UT App 114, ¶ 31. Perhaps for this reason, our legislature has provided specific requirements that must be met before a parent's rights may be terminated. First, at least one of the enumerated statutory grounds for termination must be present. *See* Utah Code § 80-4-301. Second, termination of parental rights must be in the best interest of the affected children. *In re A.H.*, 2022 UT App 114, ¶ 32. "The party seeking termination of a parent's rights bears the

burden of proof on both parts of this test," and "that party must make this required showing by clear and convincing evidence." *Id.* (quotation simplified).

¶17 At trial, Father did not contest the State's assertion that at least one of the statutory grounds for termination of his parental rights was present. He did, however, contest the State's assertion that termination was in the Children's best interest. And his appellate challenge to the juvenile court's termination order is similarly limited to the best-interest portion of the two-part test.

¶18 "The best-interest inquiry is wide-ranging and asks a court to weigh the entirety of the circumstances of a child's situation, including the physical, intellectual, social, moral, and educational training and general welfare and happiness of the child." *In re J.J.W.*, 2022 UT App 116, ¶ 26, 520 P.3d 38 (quotation simplified). Our legislature has provided important guidance regarding the best-interest question. First, statutes emphasize the importance of maintaining familial relationships where possible. As a general rule, it is "in the best interest and welfare of a child to be raised under the care and supervision of the child's natural parents." Utah Code § 80-4-104(8). This is because "[a] child's need for a normal family life in a permanent home, and for positive, nurturing family relationships is usually best met by the child's natural parents." *Id.* Therefore, "the juvenile court should only transfer custody of a child from the child's natural parent for compelling reasons and when there is a jurisdictional basis to do so." *Id.*; *see also In re A.H.*, 2022 UT App 114, ¶ 31 (stating that a parent's "fundamental liberty interest in the care, custody, and management of the parent's child . . . does not cease to exist simply because . . . a parent may fail to be a model parent" (quoting Utah Code § 80-4-104(1), (4)(a)(i))).

¶19 Next, our legislature requires that termination of parental rights be "strictly necessary." Utah Code § 80-4-301(1). "Our supreme court has interpreted this statutory requirement to mean

that 'termination must be strictly necessary to promote the child's best interest.'" *In re A.H.*, 2022 UT App 114, ¶ 36 (quoting *In re B.T.B.*, 2020 UT 60, ¶ 60, 472 P.3d 827). And as the juvenile court here correctly noted, this inquiry is to be conducted "from the child's point of view," and not from either the parent's or the prospective adoptive family's. *See* Utah Code §§ 80-4-104(12)(b), -301(1); *see also In re B.T.B.*, 2020 UT 60, ¶¶ 25 n.5, 64 (stating that the "best interest analysis should be undertaken from the child's point of view"). "[W]hen two placement options would equally benefit a child, the strictly-necessary requirement operates as a preference for a placement option that does not necessitate termination over an option that does." *In re G.D.*, 2021 UT 19, ¶ 75, 491 P.3d 867; *see also In re J.J.W.*, 2022 UT App 116, ¶ 29 ("Courts must start the best interest analysis from the legislatively mandated position that wherever possible, family life should be strengthened and preserved, and if the child can be equally protected and benefited by an option other than termination, termination is not strictly necessary." (quotation simplified)). Thus, the best-interest inquiry—informed by the "strictly necessary" requirement—"requires courts to explore whether other feasible options exist that could address the specific problems or issues facing the family, short of imposing the ultimate remedy of terminating the parent's rights." *In re B.T.B.*, 2020 UT 60, ¶ 67 (quotation simplified). In particular, "courts should consider whether other less-permanent arrangements might serve the child's needs just as well" as termination of the parent's rights would. *Id.* (quotation simplified).

¶20 With these considerations in mind, we turn to the issue at hand: whether the State presented clear and convincing evidence that termination of Father's rights was strictly necessary to promote the Children's best interest. The juvenile court determined that the State had cleared this hurdle, and it based its best-interest determination largely on two subsidiary conclusions: (1) that the Children needed stability, which the court believed could be better provided through adoption than

through a permanent guardianship arrangement, and (2) that the Children needed to be "protect[ed] against [Father's] commitment for increased and continued visitation," including protection against Father's "residual rights," which protection the court believed could be better provided through adoption than through a permanent guardianship arrangement. Father asserts that, on this record, these reasons constitute an insufficient basis to terminate his parental rights, and he maintains that the juvenile court's determination was therefore against the weight of the evidence. We agree with Father.

¶21 The court's first conclusion—that adoption affords a somewhat higher degree of stability than permanent guardianship does—is not, at a general level, a sufficient reason for terminating a parent's rights. As our supreme court recently clarified, "categorical concerns" about stability are insufficient to warrant termination of parental rights so that an adoption may occur. *See In re J.A.L.*, 2022 UT 12, ¶ 24, 506 P.3d 606. "If these categorical concerns were enough, termination and adoption would be strictly necessary across the board" because a "permanent guardianship by definition does not offer the same degree of permanency as an adoption" and "there is always some risk that the permanent guardianship could come to an end, or be affected by visitation by the parent." *Id.*; *see also In re L.L.B.*, 2023 UT App 66, ¶ 23, 532 P.3d 592 ("Categorical concerns about the lack of permanence of an option other than adoption are not enough, otherwise termination and adoption would be strictly necessary across the board." (quotation simplified)).

¶22 In this vein, we note again that permanent guardianship arrangements are themselves quite stable. *See In re A.H.*, 2022 UT App 114, ¶ 55; *see also In re J.J.W.*, 2022 UT App 116, ¶ 31 (noting that permanent guardianships "have certain hallmarks of permanency"). "A parent whose child has been placed in a permanent guardianship arrangement in a child welfare proceeding has no independent right to petition to change or

dissolve the guardianship." *In re A.H.*, 2022 UT App 114, ¶ 55; *see also* Utah Code § 78A-6-357(3)(d). "Only the guardian has that right." *In re A.H.*, 2022 UT App 114, ¶ 55; *see also* Utah Code § 78A-6-357(3)(d). And a parent, in this situation, is entitled only to "reasonable parent-time" with the child. *See* Utah Code § 80-1-102(70)(a)(iv). A guardian who does not think that a parent's parent-time request is "reasonable" may resist that request, and any disputes between the guardian and the parent about the scope of "reasonable" visitation will be resolved "by the court," with the best interest of the child in mind. *See id.* It is simply not the case—as the State implies—that a parent in this situation may demand, and obtain, as much parent-time as the parent desires. There are, of course, meaningful marginal differences in permanence and control between adoption and guardianship, and in some cases, these differences might matter. But after *In re J.A.L.*, courts focused on the virtues of stability and permanence may no longer rely on the categorical differences between the two arrangements, but must instead discuss case-specific reasons why the "added layer of permanency that adoptions offer" matters in the case at hand. *See In re A.H.*, 2022 UT App 114, ¶ 53.

¶23 In this case, the juvenile court offered a case-specific reason for its focus on stability: it was concerned about Father's "residual rights," and specifically about Father's "commitment for increased and continued visitation," and it worried that, after Father's release from prison, he might continue to have some "involvement in [the Children's] lives." We acknowledge that, in some cases, fear of a parent's residual rights might reasonably counsel in favor of terminating that parent's rights so that an adoption can take place. But this case is not one of those cases.

¶24 For starters, there is no indication that Father's continuing relationship with the Children is harmful to them, rather than merely perhaps inconvenient. *See In re L.L.B.*, 2023 UT App 66, ¶ 24 (reversing a court's termination of parental rights in part because "there was no finding . . . that [the] [f]ather's presence in

[the child's] life has affirmatively harmed" the child, and "there was no finding detailing how [the child's] life was negatively affected or disrupted by [the] [f]ather's attempts to exercise his parental rights").[4] Indeed, the juvenile court accurately noted that "there were no allegations of abuse or neglect regarding [Father] at the time the [C]hildren were ordered into [DCFS] custody," and the Children were found only "dependent"—not abused or neglected—as to him. And the court found that Father "was involved in" K.S.'s life "until he was about eight years old" and in D.S.'s life until she "was three"; that he "love[s] these [C]hildren"; and that he "expresses genuine love and affection for" them.

¶25 To be sure, Father's incarceration has placed a great degree of stress on the parent-child relationship. Because of his incarceration, Father was unable to care for the Children in their time of need when Mother abandoned them, and he was—as of the time of trial—still unable to assume custody of them. Father has, however, made a credible and determined effort to remain involved in the Children's lives despite his incarceration. With Grandmother's initial encouragement and assistance, virtual visits were arranged on a regular basis, and the juvenile court found that, "[a]t first, the [C]hildren were eager" to participate in those visits. Over time, however, the Children have lost their enthusiasm for the visits. But no party pins this loss of enthusiasm on Father's behavior regarding those visits; he remains excited about the visits, and there is no evidence that Father has ever turned down (or not shown up for) an opportunity for visits, or that he has ever acted inappropriately during any visit. Indeed,

---

4. As noted already, *see supra* note 3, no witness at trial mentioned the 2014 "supported" incident of abuse, and the protective order violations were discussed only in passing. Most importantly for present purposes, the juvenile court did not base any of its findings or conclusions on either of these incidents; in particular, it made no finding that either one was of such a nature as to render Father's relationship with the Children harmful to them.

the juvenile court specifically found that Father was "a good listener" during the visits, and Grandmother testified that Father was "very good at playing kitchen" with D.S.

¶26 The most anyone can say regarding any downside to these visits is that the Children find them boring or "uncomfortable" because they sometimes see other inmates in the background and because they do "not know what to do" during the visits. Grandmother has had to add some structure to the visits so that the Children have some things to talk about with Father; K.S. has turned to music, and D.S. to "playing kitchen." On some occasions, the Children find the visits "difficult" and need comfort from Grandmother after the visits conclude, but there is no indication from the record that this difficulty arises from anything Father does or says during the visits; indeed, it seems that the difficulty arises simply from the fact that Father is in prison, a fact that makes communicating and bonding comparatively difficult and often awkward.

¶27 Given Father's genuine efforts to maintain a meaningful relationship with the Children, as well as the absence of a "harmfulness" component to that relationship, we see no basis for the juvenile court's view that the Children need "protections against [Father's] commitment for increased and continued visitation." As a general matter, we *want* parents to exhibit a commitment toward a positive and continued relationship with their children. *See In re A.H.*, 2022 UT App 114, ¶ 55 ("Family life should be strengthened and preserved wherever possible, and . . . it is usually in the best interest and welfare of a child to be raised under the care and supervision of the child's natural parents." (quotation simplified)); *see also In re B.T.B.*, 2018 UT App 157, ¶ 55, 436 P.3d 206 ("In many cases, children will benefit from having more people—rather than fewer—in their lives who love them and care about them . . . ."), *aff'd*, 2020 UT 60, 472 P.3d 827. All else being equal, there is inherent value and benefit—not only to the parent but to the children—in maintaining familial relationships,

a fact that the juvenile court failed to discuss or account for. *See In re J.J.W.*, 2022 UT App 116, ¶ 31 (noting the "benefit of preserving the familial relationships, as our legislature has commanded courts to do 'wherever possible'" (quoting Utah Code § 80-4-104(12))). And a parent's desire to build and maintain—coupled with efforts to actually maintain—a meaningful relationship with a child is a factor that will often weigh in favor of, and not against, a determination that it is in the child's best interest to keep the relationship intact. *See In re A.H.*, 2022 UT App 114, ¶ 55. As we read this record, Father should be commended—rather than chided—for maintaining love and affection for, and a desire to continue a meaningful relationship with, the Children despite his incarceration. And Father's wish to have "visitation" with the Children after his release from prison should likewise have been viewed positively—or at least neutrally—rather than negatively in the context of the best-interest inquiry. *See id.* ("[W]e question whether—in many cases, including this one—a parent's desire to re-engage in their child's life should be viewed as negatively as the juvenile court appeared to view it.").

¶28  All of this is especially true in this case, where the prospective adoptive parent is Father's own mother. As Grandmother herself acknowledged, no matter the outcome of the case—whether adoption or guardianship—there will very likely be some sort of ongoing relationship between Father and the Children. That is, not even Grandmother believes that Father will (or necessarily should) be completely cut out of the Children's lives; instead, she testified that, in the event she is allowed to adopt the Children, she would consult with "therapist[s]" and other "people that know more than" she does about appropriate visitation, and come to a decision about the level of Father's involvement that she believes would be best for the Children. In another similar case, we defined the relevant question as follows: "[B]efore it may terminate [a parent's] rights, the [juvenile] court must adequately explain why it is better for [the Children] to have [the parent] cut out of [their lives] forever than to have [the

parent] remain involved in [their lives], perhaps with limited parent-time, pursuant to a guardianship arrangement." *In re J.J.W.*, 2022 UT App 116, ¶ 36. In cases like this one, where—given the identity of the prospective adoptive parent—nobody thinks Father really *is* going to be completely cut out of the Children's lives as a practical matter, it becomes more difficult to establish that it is best for the Children for Father's rights to be terminated.

¶29 Finally, we put almost no stock in the juvenile court's finding that the Children "expressed a desire to be adopted by" Grandmother. In this context—termination cases in which the children are not in the physical custody of the parent in question—our law allows the court to consider "the child's desires regarding the termination," but only if the court "determines [that] the child is of sufficient capacity to express the child's desires." Utah Code § 80-4-303(1)(a). The issue of the capacity of the Children to express their desires was never discussed at trial, and the juvenile court made no determination that either one of the Children had sufficient capacity. At the time of trial, K.S. was eleven years old and D.S. was six years old. While the governing statute puts no absolute age threshold on when a child's desires may be considered,[5] it is far from obvious that either of the Children—especially the six-year-old—were "of sufficient capacity" to express a meaningful opinion about the ultimate question in this case: whether Father's rights ought to be terminated to facilitate an adoption or whether Father should retain certain rights through a guardianship arrangement. In parental termination cases, a court wishing to take a child's desires into account should make a determination regarding the

---

5. Utah's adoption statutes, by contrast, establish a specific age limit regarding when a child's consent to adoption must be procured. *See* Utah Code § 78B-6-120(1)(a) ("[C]onsent to adoption of a child . . . is required from . . . the adoptee, if the adoptee is more than 12 years of age, unless the adoptee does not have the mental capacity to consent.").

child's capacity to express those desires; absent such a determination, the requirements of the statute are not met.

¶30 Moreover, even if the Children could be considered capable of offering meaningful testimony about their desires, there are evidentiary problems with the juvenile court's finding on the subject: the trial testimony did not support any finding on this issue more specific than that the Children—quite understandably—wanted to remain in Grandmother's care. Caseworker testified that the Children "would like to be adopted by" Grandmother, but she offered no additional details about her conversation with the Children. And Grandmother stated that she had discussed adoption with the Children, but she testified that D.S. responded, "That's like the commercials on TV about adopting a dog." And she acknowledged that the Children "have some misconceptions about" what adoption would mean, and that she had "tried to fix" those misconceptions. But no witness offered any testimony that could support a finding that either of the Children actually understood and appreciated the distinction between adoption and guardianship, and that, based on that understanding, they preferred adoption. In particular, no witness offered any testimony that either of the Children understood that, if an adoption were to occur, Father would lose all of his parental rights, and—relatedly—no witness offered any testimony that the Children actually wanted Father to lose all of his parental rights.[6]

---

6. In this vein, we note a general concern with evidence about a child's desires regarding termination coming in through the testimony of a prospective adoptive parent. A much better practice is for such evidence to come in through either a proffer from a guardian ad litem—the attorney specifically hired to represent the interests of the child—or through the testimony of professional witnesses (e.g., mental health counselors) who presumably have training in discussing such topics with minors

(continued…)

¶31 In the end, the facts of this case simply don't add up to strict necessity. Even though we review the juvenile court's decision deferentially, we still must reverse when "the evidence presented at trial [does] not constitute clear and convincing evidence that termination of [the parent's] rights . . . would be in the best interest of those children." *In re A.H.*, 2022 UT App 114, ¶ 38; *see also In re L.L.B.*, 2023 UT App 66, ¶ 34 (reversing the district court's decision where the "court's conclusion that termination of [a father's] parental rights was in [a child's] best interest goes against the clear weight of the evidence"). With the appropriate "clear and convincing" evidentiary standard in mind, we conclude that the juvenile court's decision in this case was against the clear weight of the evidence, and that the reasons upon which the court's analysis relied were insufficient to support termination of Father's rights.

¶32 We emphasize, however, that our decision is dependent upon the particular circumstances of this case. Those notable circumstances include the following: the juvenile court made no finding that Father's relationship with the Children was abusive or harmful; the prospective adoptive parent is Father's own mother; and Father will—in any event—likely have a relationship of some kind with the Children in the future. Moreover, there is no evidence that Father and Grandmother have the sort of relationship where he would be likely to exercise undue control over custody and care decisions in a guardianship arrangement. *See In re J.J.W.*, 2022 UT App 116, ¶ 31 (noting that guardianship might be a viable option because, among other things, there was

---

in a neutral way. By noting the absence of specific foundational evidence about the Children's desires, we are in no way faulting Grandmother for apparently not asking additional follow-up questions of the Children regarding termination; indeed, this opinion should not be viewed as encouraging prospective adoptive parents to engage in conversations with children about termination of their natural parents' rights.

"no evidence in the record that would lead us to believe that [the guardians] would be particularly susceptible to undue influence from [the parent] as concerns seeking a change or dissolution of the guardianship"); *see also In re A.H.*, 2022 UT App 114, ¶ 55. If the facts of the case were different, termination of Father's parental rights might well have been justified. For instance, if Father's relationship with the Children were abusive or detrimental, the situation would certainly be different. And we have previously noted that, where the prospective adoptive placement consists of non-relatives with no pre-existing relationship with the parent whose rights are at issue, a guardianship arrangement may be a poor fit. *See In re J.P.*, 2021 UT App 134, ¶ 11, 502 P.3d 1247 (discussing with approval a lower court's reasoning that permanent guardianship arrangements work best in situations where the parent and the guardian know each other and are "willing to work together to preserve [the] parent-child relationship" and "where the child has a healthy relationship with both the guardian and the parent," and that such arrangements may not work as well in non-relative, foster-family placement situations). But on the facts presented at the termination trial in this case, a permanent guardianship arrangement serves the Children's interest at least as well as adoption does, and therefore termination of Father's parental rights is not strictly necessary to promote the Children's best interest. *See In re A.H.*, 2022 UT App 114, ¶ 49 ("If the two placements can each equally protect and benefit the child's best interest, then by definition there does not exist clear and convincing evidence in favor of terminating a parent's rights." (quotation simplified)).

CONCLUSION

¶33 We reverse the juvenile court's order terminating Father's parental rights and remand the case for further proceedings consistent with this opinion. We note, as we have in similar cases,

that "best-interest determinations are to be conducted in present-tense fashion, as of the date of the trial or hearing convened to consider the matter." *Id.* ¶ 58. Our holding today is that, based on the evidence presented at trial in August 2022, termination of Father's rights was not strictly necessary to promote the Children's best interest. But the situation may well have changed since August 2022. In particular, we are aware that Father was scheduled to be released from prison in December 2022; the record submitted to us contains no information about whether that occurred as scheduled or, if so, what has happened since his release. If nothing has materially changed since the August 2022 trial, then we expect the court to enter an order establishing a permanent custody and guardianship arrangement, with the Children in Grandmother's care, and to make appropriate rulings, as necessary, regarding the scope of Father's reasonable visitation. But if there is evidence that matters have materially changed since the trial, the court may need to consider that evidence in some fashion, *see In re Z.C.W.*, 2021 UT App 98, ¶ 15, 500 P.3d 94, and re-assess best interest, with its strictly necessary component, based on the situation at the time of the remand proceedings.

———————